# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No:  15-cv-02718-PAB-KMT

ESTATE OF JENNIFER LOBATO, by and through its personal representative PAUL
MONTOYA;
PAUL MONTOYA, individually;
ANGELICA DELGADO;
A.Z., a minor, by and through his father, Paul Montoya;
J.M., a minor, by and through her father, Paul Montoya;
V.M., a minor, by and through her father Paul Montoya;
L.F., a minor, by and through his father, Luciano Frasquez; and
A.F., a minor, by and though her father, Luciano Frasquez,

      Plaintiffs,

v.

CORRECT CARE SOLUTIONS, LLC;
CORRECTIONAL HEALTHCARE COMPANIES, INC.;
JEFFERSON COUNTY, COLORADO;
JEFF SHRADER, in his individual and official capacity as Jefferson County Sherriff;
DEPUTY SHERRY GRAY, in her individual capacity;
DEPUTY ASHLEY ROBBINS, in her individual capacity;
DEPUTY ASHLEE CURTIS, in her individual capacity;
DEPUTY CARRIE SPAICH ("HATCH"), in her individual capacity;
DEPUTY LARRY WHEELER, in his individual capacity;
DEPUTY DANIEL LONGSHORE, in his individual capacity;
BRYAN F. MUSCUTT, in his individual capacity;
JESSICA ROMERO, in her individual capacity;
CAROLINE RYAN, in her individual capacity;
BRIANNA WHINNERY, in her individual capacity; and
ESME ZIEGELMAN, in her individual capacity;

      Defendants.

_____

## THIRD AMENDED COMPLAINT AND JURY DEMAND

_____

Plaintiffs, by and through undersigned counsel, allege the following:

## INTRODUCTION

1. On March 1, 2015, 38 year old Jennifer Lobato, a pre-trial detainee housed in Jefferson County Detention Center ("JCDF") died from an electrolyte imbalance on the cold concrete floor of her cell.

2. Ms. Lobato's preventable death occurred because of Defendants' deliberate indifference to her serious medical needs in violation of the Fourteenth Amendment to the United States Constitution.

3. Soon after entering the jail Ms. Lobato began demonstrating clear signs of withdrawal from methadone. Because of Defendants' deliberate indifference to her obviously serious medical needs, Ms. Lobato's condition continued to rapidly deteriorate until she was vomiting profusely.

4. Though Ms. Lobato and other detainees communicated to Defendants her need for immediate medical attention, thereby making them fully aware that she was withdrawing from opiates, at no time was she ever provided with any medical attention or treatment. Rather than providing her with the medical attention and treatment she so desperately needed, Ms. Lobato was forced to clean up her own vomit and left to suffer an agonizing death in her cell.

5. Alone in her cell, Ms. Lobato ultimately died from dehydration and an electrolyte imbalance, fueled by her persistent vomiting. Ms. Lobato's demise could have undoubtedly been prevented had Defendants provided her with appropriate medical attention and treatment— treatment that Defendants readily admit would have saved her life.

6.  Defendants' acts and/or omissions, which are incompatible with the dictates of the United States Constitution, directly caused Ms. Lobato's death.  Had Defendants fulfilled their clearly established constitutional obligations, Ms. Lobato would unquestionably still be alive today.

## JURISDICTION AND VENUE AND NOTICE

7.  This action arises under the Constitution and laws of the United States and is being brought pursuant 42 U.S.C. § 1983.

8.  Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331 and 1367. Jurisdiction supporting Plaintiffs' claim for attorneys' fees and costs is conferred by 42 U.S.C. § 1988.

9.  Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b).  All of the events alleged herein occurred within the State of Colorado, and all of the parties were residents of the State at the time of the events giving rise to this litigation.

10. Supplemental pendent jurisdiction is based on 28 U.S.C. § 1367 because the violations of federal law alleged are substantial and the pendent causes of action derive from a common nucleus of operative facts.

11. Pursuant to the Colorado Government Immunity Act ("CGIA"), sovereign immunity is waived for Plaintiffs' state law claims against the government Defendants for the acts and omissions complained of herein.  *See* C.R.S. § 24-10-106(1)(b) and (e) and 24-10-118.

12. On August 28, 2015, Plaintiff filed a timely written notice of claim as required by the CGIA under C.R.S. § 24-10-109.

13. Correct Care Solutions, LLC and Correctional Healthcare Companies, Inc. are private corporations, and therefore no notice of the claims against them was required under the CGIA.

**CERTIFICATE OF REVIEW**

14. Pursuant to C.R.S. § 13-20-602 counsel certifies as follows:

    a.  Counsel has consulted with a medical professional with expertise in the areas of the alleged negligent conduct as set forth in Plaintiffs' Complaint and Jury Demand;

    b.  The medical professional who has been consulted has reviewed all known facts relevant to the allegations of negligence as cited in Plaintiffs' Complaint and Jury Demand;

    c.  Based upon review of such facts, the medical professional has concluded that the filing of the claims against Defendants does not lack substantial justification within the meaning of the C.R.S. § 13-17-102(4); and;

    d.  The medical professional who has reviewed all known facts relevant to the allegations of negligent conduct and omissions as contained in Plaintiffs' Complaints meets the requirements set forth in C.R.S. § 13-64-101 et seq, including 13-64-401.

**PARTIES**

**<u>Plaintiffs:</u>**

15. At all times pertinent hereto, the decedent, Jennifer Lobato, was a citizen of the United States of America and a resident of the State of Colorado.

16. At all times pertinent hereto, Plaintiff Paul Montoya, husband of Ms. Lobato and personal representative to her estate, has been a citizen of the United States of America and a resident of the State of Colorado.

17. At all times pertinent hereto, Plaintiffs L.F., I.F., A.F., Angelica Delgado, J.M., A.Z., and V.M., children of Ms. Lobato, have been citizens of the United States of America and residents of the State of Colorado.

18. Plaintiff Angelica Delgado is the adult daughter of Jennifer Lobato.

19. Plaintiffs' L.F. and A.F. are minor children of Ms. Lobato.  They are represented through their father, Mr. Luciano Frasquez.

**Defendants:**

20. Defendant Correct Care Solutions, LLC ("CCS") is a Tennessee corporation doing business in the State of Colorado, with its principal street address located at 1283 Murfreesboro Road, Suite 500, Nashville, TN 37217.  Its registered agent of service in Colorado is located at 3773 Cherry Creek North Drive #575, Denver, CO 80209.  On information and belief, this company, along with Correctional Healthcare Companies, Inc., contracts with Jefferson County to provide medical services to inmates and detainees at Jefferson County Detention Facility and supervises and implements such care.  On further information and belief, CCS negotiates on behalf of Correctional Healthcare Companies, Inc., regarding its contract with Jefferson County.

21. Defendant Correctional Healthcare Companies, Inc., ("CHC") is a Delaware corporation with its principal street address located at 1283 Murfreesboro Road, Suite 500, Nashville, TN 37217.  CHC, backed by CCS, contracts with Jefferson County to provide medical

services to inmates and detainees at Jefferson County Detention Facility and supervises and implements such care.

22. Defendant Correctional Care Solutions, LLC, and Defendant Correctional Healthcare Companies, Inc collectively referred to as "CCS Defendants."

23. CCS Defendants are proper entities to be sued under 42 U.S.C. § 1983 for their deliberately indifferent policies, practices, habits, customs, procedures, training, and supervision of staff, including individual Defendants, with respect to the provision of medical care and treatment for inmates with serious emergency medical needs.

24. At all relevant times, the CCS Defendants were acting under color of state law and performing a central function of the state thus making them liable under § 1983. All the conduct of the CCS Defendants and its employees and agents is charged to the government, and CCS Defendants were acting jointly with the government actors.

25. CCS Defendants are properly sued for negligence as they are private corporations, not entitled to immunity under the Colorado Government Immunity Act.

26. CCS Defendants are sued directly and indirectly for negligence, negligent supervision, negligent training of their staff, for failing to ensure the provision of appropriate care in the treatment of Ms. Lobato, for the acts and omissions of their agents and/or employees, and for the herein described acts by their involved employees, agents, staff, and affiliates, who were acting within the scope and course of their employment.

27. Defendant Jefferson County is the public entity ultimately responsible for the operation of the Jefferson County Detention Facility ("JCDF"), and employed Sheriff Shrader at all relevant times. Sheriff Shrader set official policy for Jefferson County with respect to the running of JDCF at all relevant times.

6

28. Jefferson County Sheriff Jeff Shrader, in his individual and official capacity, is the public figure responsible for Jefferson County Sheriff's Department and the JCDF.  Defendant Shrader is a proper party to be sued under 42 U.S.C. § 1983 for his own conduct and for the County.

29. Defendant Jefferson County and Defendant Shrader are collectively referred to as "Jefferson County Defendants."

30. Jefferson County Defendants are responsible for the oversight, supervision and training of staff at the JCDF, including employees of CCS Defendants.  Jefferson County Defendants are properly sued under 42 U.S.C. § 1983 with respect to the hereinafter challenged deliberately indifferent policies and practices for the care and treatment of persons detained at the JCDF, as well as for the policies and practices of CCS Defendants acting as the contractually delegated final decision makers.

31. At all times relevant to the subject matter of this litigation, Defendant Sherry Gray was a citizen of the United States and a resident of Colorado.  At all relevant times, Defendant Gray was acting under color of state law in her capacity as a Deputy for the Jefferson County Sheriff's Office.

32. At all times relevant to the subject matter of this litigation, Defendant Ashley Robbins was a citizen of the United States and a resident of Colorado.  At all relevant times, Defendant Robbins was acting under color of state law in her capacity as a Deputy for the Jefferson County Sheriff's Office.

33. At all times relevant to the subject matter of this litigation, Defendant Ashlee Curtis was a citizen of the United States and a resident of Colorado.  At all relevant times, Defendant

7

Curtis was acting under color of state law in her capacity as a Deputy for the Jefferson County Sheriff's Office.

34. At all times relevant to the subject matter of this litigation, Defendant Carrie Spaich ("Hatch") was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Spaich was acting under color of state law in her capacity as a Deputy for the Jefferson County Sheriff's Office.

35. At all times relevant to the subject matter of this litigation, Defendant Larry Wheeler was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Wheeler was acting under color of state law in his capacity as a Deputy for the Jefferson County Sheriff's Office.

36. At all times relevant to the subject matter of this litigation, Defendant Daniel Longshore was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Longshore was acting under color of state law in his capacity as a Deputy for the Jefferson County Sheriff's Office.

37. At all times relevant to the subject matter of this litigation, Defendant Bryan F. Muscutt, E.M.T., was a citizen of the United States and a resident of Colorado. Defendant Muscutt was an employee of CCS Defendants and acted under color of state law.

38. At all times relevant to the subject matter of this litigation, Defendant Jessica Romero, E.M.T., was a citizen of the United States and a resident of Colorado. Defendant Romero was an employee of CCS Defendants and acted under color of state law.[1]

---

[1] According to the Jefferson County Sherriff's Office Investigative Reports regarding Ms. Lobato's death, Deputy Ashlee Curtis and EMT Jessica Romero are married. Undersigned counsel's understanding is that Deputy Curtis is an employee of Jefferson County Sherriff's Office and EMT Romero is an employee of CCS.

8

39. At all times relevant to the subject matter of this litigation, Defendant Caroline Ryan, L.P.N., was a citizen of the United States and a resident of Colorado.  Defendant Ryan was an employee of CCS Defendants and acted under color of state law.

40. At all times relevant to the subject matter of this litigation, Defendant Brianna Whinnery R.N. Charge Nurse, was a citizen of the United States and a resident of Colorado. Defendant Whinnery was an employee of CCS Defendants and acted under color of state law.

41. At all times relevant to the subject matter of this litigation, Defendant Esme Ziegelmann, R.N. Charge Nurse, was a citizen of the United States and a resident of Colorado. Defendant Ziegelmann was an employee of CCS Defendants and acted under color of state law.

## FACTUAL ALLEGATIONS

### *Jennifer Lobato's Life*

42. Jennifer Lobato was born on July 7, 1977, in Denver, Colorado.

43. Ms. Lobato spent a significant portion of her life dealing with heartbreak. When she was five years old, her mother committed suicide. Ms. Lobato could not take solace in a relationship with her only surviving parent. Her father was absent from her life and, for the duration of her childhood, she was shuffled through the foster care system.

44. Despite Ms. Lobato's tumultuous childhood, as an adult, Ms. Lobato was a loving mother. She had seven children ages ranging from age nineteen to four during her lifetime.

45. Ms. Lobato loved her children, six of whom were minors at the time of her death, and they loved her back.  Her children never lacked for clothes, toys, or food on the table.

Although she struggled with substance abuse, Ms. Lobato did her best to be a supportive and loving mother.

46. Ms. Lobato's children were devastated by the death of their mother and have suffered significant emotional trauma and losses.

*General Allegations Relating to Opiate Withdrawal*

47. Opiate addiction is recognized as a brain disorder that is caused by the use of opiate based drugs such as oxycontin, morphine, oxycodone, opium, and heroin, among other drugs.

48. Prolonged use of opiates can lead to nerve damage within the brain that causes cells to stop producing their own opiates. This effect can lead to an inability of the body to stop pain because there are no endorphins to mask the pain initially. The degeneration of the nerve cells that reduce pain can lead to a physical dependence on opiates as an external supply source.

49. Long term opiate abuse leads to physical dependence, which causes withdrawal. Withdrawal is a physical illness that results when an individual stops using opiates. opiate withdrawal  can be difficult and potentially deadly, if not identified and treated properly.

50. Symptoms typically of opiate withdrawal begin in the first 24 hours after drug usage stops and can include: muscle aches, restlessness, anxiety, lacrimation, runny nose, excessive sweating, and inability to sleep.

51. Symptoms of opiate withdrawal tend to increase in severity if left untreated.  An individual suffering from untreated opioid withdrawal typically exhibits symptoms, including but not limited to: diarrhea, abdominal cramping, goose bumps on the skin,

10

nausea and vomiting, dilated pupils and possibly blurry vision, rapid heartbeat and high blood pressure.

52. Early treatment of opiate withdrawal alleviates symptoms and prevents progression of symptoms and death.

53. Opiate withdrawal is a very common condition that, when recognized and treated, rarely results in death.

54. It is well known to all levels of medical professionals as well as prison and jail staff that if left untreated, or improperly treated, opiate withdrawal can result in severe dehydration due to prolonged vomiting or diarrhea, and, ultimately, death.

***Ms. Lobato Immediately Informed the Arresting Officer that she was Heroin User and was Concerned About Going into Withdrawal***

55. On March 1, 2015, at approximately 3:05 P.M., Ms. Lobato was arrested for allegedly stealing merchandise from the Old Navy Store at 439 S. Wadsworth Blvd in Lakewood, Colorado.

56. During the ten-minute car ride to the Jefferson County Detention Facility ("JCDF"), Ms. Lobato readily admitted to Officer Wendy Trentaz of the Lakewood Police Department that she was a heroin user and that she was concerned about going to jail because of her fear of withdrawing from the drug.

***CCS Defendants provide medical care in JCDF***

57. CCS Defendants have a contract with Jefferson County to provide medical care to inmates and detainees in JCDF.

58. CHC was operating in Colorado as a provider of jail medical services in 2014 when it merged with or was acquired by CCS.

11

59. According to Bloomberg.com, CCS "acquired" CHC in July 2014.

60. According to CCS's website, CCS and CHC "merged" in 2014.

61. CHC remained as a corporation, but upper level management of CHC moved to Tennessee, the home location of CCS.  CHC and CCS now share a principal place of business in Tennessee.

62. On information and belief, CCS and CHC are jointly benefit from and participate in the management and operation of contracts for the provision of medical services to inmates and detainees in various jails around the country, including Jefferson County Jail.

63. CCS and CHC are working toward merged policies and procedures and hold themselves out as a combined company.  CHC, according to statements by CCS's CEO, operates "as a division of CCS."

64. CHC is managed by CCS and CCS participates in the overseeing of the CHC contracts. CCS currently advertises for positions for JCDF medical staff on its website.

65. Jorge Dominicis, current CEO of CCS, announced in a July 23, 2014 letter to another jail serviced by the companies that CHC and CCS were merging and that while they intend to "maintain the legal names of both companies to allow for a smooth transition with [their] clients, vendors and stakeholders" that they "will immediately begin referring to [themselves] and doing business as Correct Care Solutions."

66. This letter promises that "[w]hile we will maintain a regional office in Denver, many support services will be provided from our Nashville home office.  Over time, in cooperation with our clients, policies and procedures will be integrated to ensure that best practices of the industry are in place."

12

67. Also in this letter to a client, the CEO of CCS explains that "[t]here may be some changes at the regional level to increase support, improve operational efficiencies, and foster enhanced oversight and management."

68. Right after this merger, CCS announced on its facebook page a map of the United States showing its facilities nationwide, including the Colorado facilities and stating "look at our new footprint! 450 facilities and growing."

69. CCS treats CHC as part of the company and they jointly manage the jail facilities for whom CHC has the contract.

70. On information and belief, CHC stays the named entity on contracts until the contract comes up for a new bid at which time CCS puts in the bid.

71. On information and belief, this "combined company" works together to deliver services and organize policies for jail medical care, are jointly managing and overseeing the provision for medical care in JCDF and are both properly sued for the joint herein complained of deliberately indifference policies, customs, training and supervision.

***Ms. Lobato Immediately Started Feeling Ill upon Arrival at the Jefferson County Detention Facility***

72. At approximately 5:00 p.m. on March 1, 2015, Ms. Lobato arrived at the JCDF for booking and processing.

73. At all times relevant to this complaint, Ms. Lobato was in the custody of the Jefferson County Sheriff's Office ("JCSO") which operates the JCDF.

74. At approximately 5:15 P.M., Deputy John Garcia, who was assigned to the JSCO booking unit, fingerprinted, obtained a DNA sample, and photographed Ms. Lobato.

75. Despite the fact that Ms. Lobato was already experiencing symptoms of withdrawal and had just told Officer Trentaz that she was concerned about withdrawing from heroin at

13

the jail, Deputy Garcia stated that Ms. Lobato did not appear under the influence of any substance and did not admit to drug use prior to her arrest.

76. At approximately 5:30 P.M., Deputy Rachel Obermeyer, who was assigned to work Modular 7B, was called to booking to strip search Ms. Lobato.

77. Although Ms. Lobato was already visibly showing signs of withdrawal and had just expressed concern about her health to Officer Trentaz, Deputy Obermeyer stated that Ms. Lobato didn't appear to be under the influence and that she did not ask for medical attention.

78. Both EMT Jessica Romero and EMT Bryan Muscutt, who were assigned to the booking unit to conduct intake evaluations, performed Ms. Lobato's intake.

79. Although the goal of the intake process is to determine whether an inmate needs medical attention, and despite their medical training, EMT Romero and EMT Muscutt both stated that Ms. Lobato never admitted to any drug use and did not exhibit signs of withdrawal.

80. Pursuant to Defendant CCS's policy, initiation of the opiate withdrawal protocol is required to begin at booking if an inmate affirmatively confirms drug usage or exhibits any signs of withdrawal.

81. The opiate withdrawal protocol at JCDF requires that an EMT check an inmate's vital signs and a nurse screens the inmate for any clinical indications of withdrawal, which includes using the opiate scoring system or COWS.  Any symptoms shown by the inmate will require that the protocol is initiated.

82.  Although upon information and belief Ms. Lobato was showing visible signs of withdrawal, including but not limited to sweating and shaking, JCDF's written opiate

14

withdrawal protocol was ignored by EMT Romero and EMT Muscutt and Ms. Lobato was never screened for any clinical indications of withdrawal.

83. At approximately 8:45 P.M., Deputy Delmy Kobar escorted Ms. Lobato from the Booking Unit to Unit 6A.

84. Deputy Jaclyn Martinez was assigned to Unit 6A.  Deputy Martinez gave Ms. Lobato a brief orientation and assigned her to cell number 10.

85. Immediately upon entering her cell, multiple inmates situated near Ms. Lobato personally witnessed her verbalizing that she was experiencing withdrawal and presenting signs of withdrawal.

86. Inmate Samantha Hill spoke with Ms. Lobato after her assignment to Unit 6A on March 1, 2015, in the dayroom.  During the Jefferson County Sheriff's Office investigation into Mr. Lobato's death conducted Investigator Elias Alberti, Hill stated that Jennifer told her she was not feeling well as she was "coming off heroin." Ms. Hill also stated that Ms. Lobato told her that she had used heroin a couple of hours before being arrested, that she had not seen Ms. Lobato eat any food, and that it appeared as though Ms. Lobato only wanted to sleep.

87. During the Jefferson County Sheriff's Office investigation into Mr. Lobato's death conducted Investigator Elias Alberti, Inmate Porfira Farias-Contreras stated that "Ms. Lobato came to jail and I immediately heard her throwing up."

88. During the Jefferson County Sheriff's Office investigation into Mr. Lobato's death conducted Investigator Elias Alberti, inmate Natasha Marie Keener stated that she heard Ms. Lobato say she was "coming off heroin." Ms. Keener explained that Ms. Lobato looked sick and was shaking a lot, and that inmates tried to keep an eye on her and gave

her an extra blanket.  Ms. Keener stated that she looked in on Ms. Lobato three times on March 1, 2015, and saw her "flip flopping" around on her bed.

89. Upon information and belief, Ms. Lobato's first cellmate in Cell 10, Amber Lyn Joy Evans, who was transferred out of Cell 10 at 3:00 a.m. on March 2, 2015, by Deputy Martinez, witnessed Ms. Lobato throwing up and shivering.

90. Deputy Martinez admitted that at 5:00 a.m. on March 2, 2015, Ms. Lobato did not get out of her cell to get her breakfast meal tray from the lower level.

91. During the Jefferson County Sheriff's Office investigation into Mr. Lobato's death conducted Investigator Elias Alberti, inmate Lisa Gordon stated that at breakfast, numerous inmates, including Ms. Gordon, told the deputies that Ms. Lobato was sick and needed medical attention.  The deputies ignored the inmates and made no attempt to check on Ms. Lobato or call for medical attention.

92. Despite the claims from Deputy Martinez, other deputies, and medical personnel that Ms. Lobato did not present signs of withdrawal, it is evident from numerous witnesses that the deputies willfully and wantonly, showing deliberate indifference to her obvious serious medical needs, ignored her serious medical needs from the beginning of her incarceration.

93. Deputy Martinez and the other deputies claimed inability to detect that Ms. Lobato was withdrawing—something that untrained inmates were easily able to notice— are either false or, if true, clearly demonstrates that they had not received adequate training and/or supervision.

***Jail and Medical Staff Continue to Ignore Ms. Lobato's Worsening Symptoms of Opiate Withdrawal and Pleas for Help***

94. At approximately 8:30 a.m. on March 2, 2015, Nurse Caroline Ryan conducted her daily morning medication disbursement to the inmates in Unit 6A.

95. Upon information and belief, and despite numerous Unit 6A inmates' attempts to direct Nurse Ryan's attention to Ms. Lobato's worsening condition by informing her of the clear and obvious withdrawal symptoms Ms. Lobato was exhibiting, Nurse Ryan deliberately ignored Ms. Lobato's serious medical needs.

96. On the morning of March 2, 2015, Ms. Lobato's fellow inmates continuously informed the deputies of Ms. Lobato's worsening medical condition by knocking on the window of the dayroom. Deputy Curtis acknowledged their pleas for help for Ms. Lobato and waved them away from the window.  Specifically, inmate Porfira Farias told Deputy Curtis that "she [(Ms. Lobato)] needs help."  Rather than provide Ms. Lobato with adequate medical attention, Deputy Curtis callously said "don't worry, she [(Ms. Lobato)] was doing drugs, so don't feel bad for her."  Despite Deputy Curtis having actual knowledge that Ms. Lobato worsening medical condition was a direct result of a drug withdrawal, she deliberately refused to assist her.

97. At approximately 9:30 a.m. on March 2, 2015, Deputy Ashley Curtis summoned Ms. Lobato for advisements. At this point in time, Ms. Lobato had been vomiting for several hours. Ms. Lobato, in the midst of withdrawal, told Deputy Curtis that she did not feel well and was not sure if she could make it to court. Instead of noticing the obvious symptoms of withdrawal or taking Ms. Lobato to receive medical attention, Deputy Curtis told her that advisements were not optional and she was required to go.

98. At approximately 10:00 a.m., Ms. Lobato pressed her cell's call button, summoning deputies and JCDF personnel in the hope that they would help her. Upon arrival at Ms.

17

Lobato's cell, these deputies failed to notice, and/or willfully and wantonly ignored Ms. Lobato's obvious withdrawal symptoms and her clearly serious medical needs. Therefore, in addition to being informed of Ms. Lobato's serious medical needs by other inmates, Ms. Lobato's symptoms were clearly visible to the deputies and JCDF personnel.

***Both Deputy Wheeler and Deputy Longshore Ignored Ms. Lobato's Serious Medical Needs***

99. Deputy Larry Wheeler was assigned to escort Ms. Lobato to advisements.  Ms. Lobato complained to Deputy Wheeler of her withdrawal symptoms and asked several times to sit down because it was difficult for her to even stand up.  Deputy Wheeler observed Ms. Lobato lying on the floor, explained condition and symptom he admitted that he has previously encountered with inmates who come from SHU (special housing units) for advisements do when they are withdrawing.  Deputy Wheeler explicitly acknowledged that it appeared to him that Ms. Lobato was not feeling well and was likely to throw up. Nonetheless, Deputy Wheeler did absolutely nothing to ensure that Ms. Lobato was provided with needed medical attention and failed to inform medical personnel of her condition.

100.       Deputy Wheeler has admitted that *even if* he knew that Ms. Lobato was withdrawing and/or vomiting, he would not have necessarily called medical.  He stated that he could not remember ever receiving training about dealing with inmate withdrawal symptoms previously.

101.       Ms. Lobato also specifically told Deputy Daniel Longshore, who was also assigned the video advisement room at the JCDF, that she was experiencing withdrawal symptoms and that she did not feel well because she was withdrawing.

18

102.    Despite these pleas for help and the dramatic decline in Ms. Lobato's condition, toward the end of advisements, and even though Deputy Longshore admitted that the practice at JCDF is to send inmates complaining of withdrawal symptoms to SHU to be more closely monitored, Deputy Longshore made no effort to ask Ms. Lobato any follow up questions, willfully ignored her withdrawal symptoms, and failed to ensure that she received proper medical attention.

***Deputy Hatch and Deputy Curtis Failed to Provide Ms. Lobato Adequate Medical Attention***

103.    Upon returning from advisements at approximately 11:30 a.m. on March 2, 2015, Ms. Lobato explicitly told both Deputy Ashely Curtis and Deputy Carrie Spaich ("Hatch") that she was withdrawing, experiencing withdrawal symptoms, and would therefore not be able to attend 1:00 pm advisements.  Deputy Hatch asked Ms. Lobato to clarify what she meant by "withdrawing." In response, Ms. Lobato explained that she was withdrawing from "meth."  Despite Ms. Lobato's assertion that she was suffering from potentially life-threatening withdrawal, neither Deputy Curtis nor Deputy Hatch took any action to gather more information about her symptoms or ensure that she received adequate medical attention.

104.    Monica Albers, Health Administrator for CCS at JCDF and Lynn Pilpott, Regional Vice President for CCS, stated that they would have wanted their staff to clarify what "meth" refers to when an inmate complains about withdrawal symptoms.

105.    Both Deputy Curtis and Deputy Hatch admitted that it was strange that Ms. Lobato was housed in the upper tier of the module because it is customary for inmates who are withdrawing to be housed in a lower tier of the module. Neither Deputy made an

19

attempt to move Ms. Lobato to a lower tier after learning that she was going through withdrawal.

106.	After learning of Ms. Lobato's withdrawal, Deputy Hatch noted that Ms. Lobato refused to eat lunch.

107.	After learning of Ms. Lobato's withdrawal, Deputy Curtis looked up Ms. Lobato in the JCDF intake system to see if there was any information about what she was withdrawing from or if there was any medical protocol in place.

108.	After learning of Ms. Lobato's withdrawal, Deputy Curtis followed up with the EMT in the booking unit, Jessica Romero, who had completed Ms. Lobato's intake process the previous night.  EMT Romero told Deputy Curtis that Ms. Lobato provided no information regarding withdrawing from anything and added that "they don't really have a protocol for meth anyway."  EMT Romero asked no follow up questions regarding Ms. Lobato's withdrawal symptoms and made no attempt to clarify to what substance "meth" referred.

109.	Deputy Curtis relayed the information from EMT Romero to Deputy Hatch, commenting that withdrawing from meth is "something that someone just has to go through."

110.	Even though Deputy Curtis, Deputy Hatch, and EMT Romero had actual knowledge that Ms. Lobato was in withdrawal and were aware of her deteriorating symptoms, none of them made any attempt to ensure she received medical attention.

111.	Nurse Ryan returned to Unit 6A between 11:15 a.m. and 11:45 a.m. on March 2, 2015, to do a special medication distribution after the inmates returned from court.  After Nurse Ryan completed her distribution, she performed a medical check on several

inmates who were in withdrawal from a variety of substances.  Despite the fact that Deputy Curtis and Deputy Hatch were aware of Ms. Lobato's condition, they did not ask Nurse Ryan to examine Ms. Lobato.

112.     Upon information and belief, numerous inmates again alerted Nurse Ryan to Ms. Lobato's serious medical needs during her medication pass.  Despite this notification that Ms. Lobato was in withdrawal and untreated, Nurse Ryan again deliberately disregarded Ms. Lobato, failed to provide any form of examination on her, and left Unit 6A at approximately11:45 a.m. without ever evaluating Ms. Lobato's condition.

### *Ms. Lobato was Excused from 1:00 pm Advisements because She was Too Ill*

113.     At approximately 12:30 p.m. on March 2, 2015, Deputy Wheeler noticed that Ms. Lobato was due to attend Lakewood advisements at 1:00 p.m.  Although Deputy Wheeler had done absolutely nothing to ensure that Ms. Lobato received medical attention, he called the deputies in Unit 6A to inquire as to whether they thought Ms. Lobato's symptoms were so severe that she would be unable to make it through advisements.

114.  One of the deputies in Unit 6A told Deputy Wheeler that Ms. Lobato was "starting to get sick" and Deputy Wheeler called to have Ms. Lobato's advisements postponed.

115.  In his interview with investigators from the JCDF regarding Ms. Lobato's death, Deputy Wheeler explained that his extensive experience in corrections and that, in his professional opinion, it appeared as though Ms. Lobato was going through withdrawal. Despite the fact that (1) Deputy Wheeler knew that Ms. Lobato was in withdrawal and (2) numerous deputies, including but not limited to Deputy Curtis and Deputy Hatch on Unit 6A and EMT Romero, knew that Ms. Lobato was too sick to go to 1:00 p.m. advisements, *no one made any attempt* to get Ms. Lobato medical attention.

21

***Inmates in Unit 6A Continued to Alert the Deputies of Ms. Lobato's Ever Worsening
Withdrawal Symptoms***

116.  Between 1:00 p.m. and 4:00 p.m., numerous inmates alerted the deputies that Ms.
Lobato's condition was deteriorating.  In an interview with investigators following Ms.
Lobato's death, the inmates in Unit 6A described their efforts to assist Ms. Lobato by
informing nearly every person within earshot of Ms. Lobato's condition.

117.  Sunda Gawryl stated: "Jennifer did not look well and was 'puking' since she arrived in
the module…Jennifer was 'getting sick' in the afternoon sometime before 3:00 pm.  Ms.
Gawryl notified the module deputies at that time via the dayroom intercom that Jennifer
was sick."

118.  Taylor Lanning stated: "This morning (Taylor Lanning) woke around 8:00 am as she
could hear Jennifer vomiting in her cell.  Taylor assumed Jennifer was withdrawing from
heroin.  Taylor could hear the sound of vomiting throughout the day.  Taylor and other
inmates told Deputy Gray, Robbins, and Curtis that Jennifer was sick and needed medical
attention."

119.  Samantha Hill stated: "After dinner, while returning their food trays, multiple inmates
told the deputies that Jennifer needed medical attention."

120.  Porfira Farias – Contreras stated: "At one point in the day Porfira told Deputy Curtis
that Jennifer was 'puking'…When the inmates were out to get dinner, Porfira and the
other female inmates told module deputies that Jennifer needed medical attention."

121.  Claudia Esther Martinez stated: "Right before dinner was served in the module, Lobato
threw up everywhere…Martinez stated that she and other inmates had tried telling the
deputies that Lobato looked really sick and that they thought she was 'coming off

something.'  According to Martinez, she and the other inmates also told the deputies that they need to take Lobato to the Special Housing Unit (SHU)."

122.  Natasha Maria Keener stated: "Keener kept shaking her head and stated, "We all said something, "but" nobody came and checked on her.  Keener told me that since Lobato moved in she had been 'out of it,' shaking and sick."

123.  Lisa Gordon stated: "Lobato activated the call button in the dayroom and the deputies either did not answer her or when they did, 'they were talking shit.'  She saw Lobato lying down in the cell at one point today before lunch.  Gordon could hear Lobato 'retching like crazy' during dinnertime and she told Deputy Gray and Curtis again that Lobato needed to go to the SHU.  All the inmates around Ms. Lobato's cell were telling Deputy Gray, Curtis, and Robbins that she was more than just ill and she needed medical attention right away."

124.  Although Deputy Curtis refused to get Ms. Lobato any medical attention, after lunch, she placed inmate Crystal Chavez into Ms. Lobato's cell, indicating to Chavez that she knew Ms. Lobato was withdrawing and that Chavez was to help take care of her during her withdrawal.

125.  As soon as Ms. Chavez entered the cell, Ms. Lobato was already sick.  Ms. Chavez noticed that Ms. Lobato had all the classic signs of withdrawal, including "chills, sweating, puking, diarrhea, and restless legs."

126.  According to Ms. Chavez, Ms. Lobato apologized to Ms. Chavez and said, "This room is a mess, I am a mess.  You don't want to be in here."

***Deputy Gray, Robbins, and Curtis Retaliated Against Inmates for Continually Pleading for Medical Attention for Ms. Lobato***

127. In a desperate attempt to get help for Ms. Lobato, the inmates in Unit 6A continually pushed the intercom buttons in their cells to get the deputies' attention.

128. Instead of listening to the inmates, the deputies, including Robbins, Gray, and Curtis retaliated, against the inmates by yelling at them and searching their cells for contraband.

129. In an interview with investigators following Ms. Lobato's death, the inmates in Unit 6A described the deputies' reprehensible comments and conduct.

   a. Taylor Lanning stated: "Taylor said the deputies would respond by laughing and say she should not have come to jail on drugs. Taylor said the deputies also told the inmates they 'shouldn't get high.'"

   b. Samantha said Deputy Gray told the inmates in response to their pleas for the deputies to provide medical care for Ms. Lobato, 'if you want to run things don't come to jail' and "'hut the fuck up or you'll be locked down for three days.'"

   c. Porfira Farias-Contreras: "I told Deputy Curtis she needs help. Deputy Curtis then replied back, 'don't worry, she was doing drugs, so don't feel bad for her'…Around 3:45 pm, the guards got upset because we were pushing the help buttons too much. They performed a search of everyone's cell. Deputy Gray said, 'OK, you guys are pushing your buttons so much, you all get cell shakedowns.'"

   d. Lisa Gordon: "In response to warning the deputies that Ms. Lobato needed help, the deputies replied, 'Shut the fuck up,' and that until the inmates were cops, they did not run the module. Martinez told me that the deputies were laughing about Lobato when the inmates told them that she was sick and that some of the deputies working here checked on the inmates, but 'these ones (deputies) don't.'"

24

    e.  Natasha Maria Keener "'Keener stated that Deputy Gray yelled and cussed at them and told the inmates that they did not 'run shit.'"

    f.  Amber O'Neal: "Ms. Chavez was telling the deputies how sick Ms. Lobato was and that she wanted to be transferred to another cell.  The deputies responded, 'we will drag you back into your cell.  You'll go in if you like it or not, you have no choice…I heard Deputy Curtis say 'when you do drugs, you can't expect to come to jail and get medical care.'"

130.  Deputy Gray also punished three inmates (Claudia Esther Martinez, Lisa Kay Gordon, Natasha Marie Keener) in retaliation for trying to save Ms. Lobato's life by writing them up for a one day lock down for trivial violations, such as "not wearing wristbands" and "inappropriately asking for toilet paper."

131.  Deputy Robbins and Deputy Gray began searching the Unit 6A cells at approximately 4:00 P.M. on March 2, 2015.  When the deputies got to Cell 10, Deputy Gray opened the cell door and told Deputy Robbins that Ms. Lobato was inside sleeping.  Deputy Curtis had previously told Deputy Gray that Ms. Lobato was withdrawing from "meth."  Deputy Gray woke Ms. Lobato up and asked her if she was withdrawing and she replied "yes." Neither Deputy Gray nor Deputy Robbins made any attempt to clarify what Ms. Lobato was withdrawing from, ask any additional questions about her condition, or provide her with medical attention.

132.  Deputy Gray admitted that although it was not standard protocol for an inmate to be inside a cell during a search, she did not ask Ms. Lobato to move because she was too sick.  Although the deputies thoroughly searched Ms. Lobato's cell for contraband, they

25

again decided not to get her medical attention despite their conscious awareness of the
seriousness of her medical condition.

133.  Upon information and belief, as part of their regular duties, Deputies Curtis, Robbins,
and Gray were required to do routine walk-throughs of the unit. Upon information and
belief, during each walk through of the unit, Deputies Curtis, Robbins, and Gray
deliberately ignored Ms. Lobato's serious medical needs.

*For the Third Time on March 2, 2015, Nurse Ryan Deliberately and Recklessly Ignored
Ms. Lobato's Serious Medical Needs*

134.  Nurse Ryan arrived at Unit 6A at approximately 4:30 P.M. for another special
medication distribution. During this special medication distribution, Deputy Robbins told
Nurse Ryan that Ms. Lobato was withdrawing from "meth" and had supposedly not told
anyone in the intake unit.

135.  Nurse Ryan explained that "they could not give any medications for meth withdrawal,
and if she had her way, everyone would withdraw from meth because it was the best
[drug to] withdraw from."  Thereafter, Nurse Ryan quickly left the unit.

136.  Despite knowing that withdrawal-related illnesses can be fatal, Nurse Ryan never
clarified what Deputy Robbins meant by "meth" nor determined from what drug exactly
Ms. Lobato was experiencing withdrawal.  Moreover, Nurse Ryan never inquired about
Ms. Lobato's physical condition, nor made any attempt to see her, even though Ms.
Lobato was no more than fifteen feet away from her.

*Even After All Parties Admit Knowing that Ms. Lobato was Withdrawing from Methadone,
She Still Received No Medical Treatment*

137.  At approximately 5:00 P.M. on March 2, 2015, Ms. Chavez, Ms. Lobato's cellmate in
Cell 10, returned to her cell for lock down.  As she entered the cell, she was overcome by

26

the smell of vomit and asked Ms. Lobato what was wrong.  Ms. Lobato apologized and said she was "coming off heroin."

138.  Ms. Chavez again pressed the call button to tell deputies that Ms. Lobato was extremely sick and needed help.  Instead of asking about Ms. Lobato's condition, Deputy Gray instructed Ms. Chavez to clean up the cell.

139.  After vomiting from the smell in an attempt to clean the cell, Ms. Chavez refused to finish cleaning up and left the cell.  Instead of checking in on Ms. Lobato or calling medical for help, Deputy Gray told Ms. Lobato that she would only receive medical attention after the cell had been cleaned.

140.  While Deputy Gray was in Ms. Lobato's cell, forcing her to clean up her own vomit, Ms. Lobato told Deputy Gray that she was withdrawing from methadone.  Despite having direct knowledge of Ms. Lobato's rapidly deteriorating medical condition for nearly twelve hours, only then did Deputy Gray notify Deputy Curtis to call medical so as to inform them know that Ms. Lobato had vomited and was withdrawing from methadone.

141.  Deputy Curtis spoke to Nurse Brianna Whinnery and told her that Ms. Lobato was "changing her story," now saying she was withdrawing from methadone.

142.  Nurse Whinnery made no further inquiry about Ms. Lobato's current physical condition. Instead, Nurse Whinnery told Deputy Curtis that Ms. Lobato would be put on the list for evening medication rounds.  Although Nurse Whinnery knew that Ms. Lobato was withdrawing from methadone, a drug which she admitted had a particular withdrawal protocol, Nurse Whinnery did not ask any follow up questions, immediately have someone from medical sent to see Ms. Lobato, or otherwise follow the established protocol.

143.  When Nurse Whinnery passed off medical information to Nurse Esme Ziegelmann, the charge nurse for the night shift, Nurse Whinnery told Nurse Ziegelmann that Ms. Lobato had lied on her intake sheet and was withdrawing from methadone.   Although Nurse Ziegelmann did not have any information about whether Ms. Lobato was on a protocol for withdrawal, she did not ask any further questions and made no attempt to follow up on Ms. Lobato's condition.

144.   Although it had been clear for quite some time that Ms. Lobato needed immediate medical attention, medication rounds would not begin until 7:30 pm that evening, over 2 ½ hours after all the deputies in Unit 6A and medical personnel were unambiguously on notice that Ms. Lobato was withdrawing from methadone and had not been screened by medical or placed on the opiate withdrawal protocol in accordance with CCS policy.

145.   At approximately 5:55 P.M., Ms. Lobato asked Ms. Chavez when she would be receiving medical attention for her condition.  Ms. Chavez noted that Ms. Lobato had been lying in bed the entire time since she had been moved into the cell other than to clean up the vomit on her cell floor.

146.   Ms. Chavez told Ms. Lobato that she would need to make a scene if she wanted immediate medical attention.  Ms. Lobato responded by telling Ms. Chavez that she couldn't take such action because of the severity of her sickness.

147.    Although Ms. Lobato was obviously in immediate need of serious medical attention, the deputies and medical staff continued to willfully ignore her, leaving her to experience her withdrawal symptoms in a vomit-covered cell.

***Despite Ms. Lobato's Making One Last Attempt to Get Help, the Deputies and Medical Staff Willfully and Wantonly Ignored Her Until She Died Alone in Her Cell***

148.    At approximately 7:00 P.M. on March 2, 2015, Ms. Lobato once more pushed the intercom button in her cell and desperately pleaded for medical attention. Yet again, the deputies in Unit 6A, including Deputy Gray, ignored her serious medical needs and told Ms. Lobato that she would attended to during the nurse's evening medication rounds.

149.    At approximately 7:19 P.M., Ms. Chavez frantically pressed the intercom button inside the cell and screamed, "I don't think she [(Ms. Lobato)] is breathing." Only then, for the first time, did the deputies, including Deputy Gray and Deputy Robbins, urgently respond to Ms. Lobato.

150.    After Deputy Robbins called for medical assistance, Deputy Gray and Deputy Robbins went to Ms. Lobato's cell. There, they found her lying on the sled bed on her back, with her limp head hanging slightly over the top edge. From the door of the cell, Deputy Gray and Deputy Robbins could see that Ms. Lobato was pale and her lips were slightly blue.

151.    Deputy David Whetstone, Deputy Carlos Enriquez and Deputy Gray arrived and began CPR. At approximately 7:30 P.M., the AMR paramedic medical team and Golden Fire Rescue arrived. They attempted to revive Ms. Lobato using an Automatic External Defibrillator (AED). Their attempts to breathe life back into a lifeless, vomit-caked Ms. Lobato failed.

152.    At 7:45 P.M. on March 2, 2015, more than 10 hours after Ms. Lobato first requested medical attention, she was pronounced dead.

153.    The official cause of death was "cardiac arrest due to probable electrolyte abnormalities, due to repeated vomiting."

154.    Ms. Lobato was thirty-eight years old when she died.

***Ms. Lobato's Death Was Easily Preventable***

155.   Jefferson County Sheriff Jeff Shrader readily admitted that Ms. Lobato's death was preventable stating "Yes, she (Ms. Lobato) might be alive today if there was an intervention."

156.   Dr. Michael Jobin, Plaintiffs' retained expert, confirmed Sheriff Shrader's statement. "[Ms. Lobato's] death was preventable by simple medical care and treatments, and even up until the immediate time of her death, her treatments with IV fluids and electrolyte replacements would have saved her life."

157.   Simply put, Ms. Lobato died from dehydration. Ms. Lobato's dehydration was due to lack of appropriate medical care.

***Unconstitutional Policies, Practices, and Customs Regarding Medical Care of Inmates at the JCDF***

158.   Upon information and belief, the CCS Defendants and Jefferson County Defendants maintained unconstitutional policies, practices, and customs regarding medical care for inmates.

159.   Defendant CCS and CHC and Defendant Jefferson County had a contractual agreement by which Defendant CCS would provide medical services at the JCDF.

160.   Upon information and belief, the contract entered into between Defendant CCS and CHC and Defendant Jefferson County made the CCS Defendants responsible for providing medical, dental, psychiatric, technical, and pharmaceutical, and support personnel necessary for the rendering of health care, services to inmates at the JCDF.

161.   Upon information and belief, CCS Defendants and Jefferson County Defendants failed to adequately train and supervise their jail and medical staff, amounting to deliberate indifference to the serious medical needs of inmates presenting with opiate withdrawal.

162.   Upon information and belief, jail personnel were not trained to care for inmates who suffered from opiate withdrawal.   Jail personnel were not trained as to when they were required to notify medical personnel that an inmate needs medical attention.

163.   Upon information and belief, medical staff was not trained to treat opiate withdrawal as a serious medical condition.   Medical staff was not trained to identify persons who were at a high risk of opiate withdrawal. Medical staff was trained not to provide preventative medicine to persons who were at a high risk of opiate withdrawal.

164.   Upon information and belief, instead of treating opiate withdrawal appropriately, medical staff was trained to adopt a wait and see approach, without meaningful or appropriate evaluation.   Medical staff was not trained on the importance of monitoring inmates (including taking vitals) who were suffering from opiate withdrawal.

165.   If treated appropriately, opiate withdrawal, while serious, is very rarely fatal.

166.   That so many involved employees engaged in such dereliction of duty with respect to opiate withdrawal also shows the deliberately indifferent widespread policy, custom and habit as well as training and supervision of deliberate indifference to withdrawal.

167.   Further, there is a policy, practice, and widespread custom of knowingly disregarding the risk of even serious medical needs of inmates by jail nurses.

168.   There is also a policy, practice, and widespread custom of using nurses to provide provider level diagnoses and evaluation, including to rule out serious medical conditions without constitutionally sufficient evaluation.

169.   But for CCS Defendants and Jefferson County Defendants' highly deficient training (or lack thereof), Ms. Lobato's death could have been prevented.

170.   But for CCS Defendants and Jefferson County Defendants' policy, custom, or practice that medical staff did not need to check on inmates despite a request for medical attention, Ms. Lobato's death could have been prevented.

171.   These deliberately indifferent practices, customs, habits, training, supervision and policies were moving forces in Ms. Lobato's death.

172.   CCS Defendants and Jefferson County Defendants' policies, customs, and practices were so far outside of the standard of care for medical professionals as to be obviously reckless to a layperson and deliberately indifferent to the known serious medical needs of inmates presenting with seirous medical conditions, including opiate withdrawal.

### CCS Defendants Have a Long History of Failing to Provide Adequate Medical Care in Detention Facilities.

173.  At the time of the events alleged herein, CCS Defendants are part of an associated group of national companies with a disgraceful history of failing to provide constitutionally adequate medical care to inmates.

174.  There is an abundance of examples in Colorado, and nationwide, establishing that the CCS Defendants and the counties that employ them are deliberately indifferent in their policies, customs, and practices with respect to the medical needs, and constitutional rights, of inmates.

175.  In *McGill v. Correctional Healthcare Companies, Inc. et al.*, Case No. 1:13-cv-01080-RBJ-BNB (D. Colo.), Kenneth McGill sued Defendant CCS for deliberately indifferent failure to provide appropriate medical care in response to a stroke he suffered at the Jefferson County Detention Facility.  Similar to Ms. Lobato's case, Defendant CCS employees, acting with deliberate indifference, failed to take Mr. McGill to a hospital in a

timely fashion where he could have received necessary emergency medical care.   This case went to trial and resulted in a plaintiff's verdict for approximately $11 million.

176.  The jury in the *McGill* trial found that CHC, which had not merged with CCS at the time of the deliberate indifference in that case, had unconstitutional policies or informal customs in that when an inmate at the Jefferson County Jail presented to the nursing staff with subjective complaints of a serious medical condition, even if the nurse suspected that the inmate might be suffering from a condition requiring urgent review by a doctor, the nurse would not call the on-call doctor or call 911 or send the patient to the hospital unless and until the nurse was satisfied that there was objective evidence that the inmate was probably suffering from the condition.

177.  The jury also found that CHC had constitutionally deficient training and supervision of nurses in the Jefferson County Jail.

178.  The jury found, just months before Ms. Lobato's unnecessary death, that these customs and deficient training and supervision were moving forces in CHC nurses unconstitutionally injury Mr. McGill.

179.  Despite CCS Defendants and County Defendants being thus expressly aware of this problem with nursing staff and training, this practice and custom and deliberately indifference in training and supervision was allowed to continue acting as a moving force in Ms. Lobato's death.

180.  *In Revilla v. Stanley Glanz, Sheriff of Tulsa County, et al.*, Case No. 4:13-cv-00315-JED-TLW (N.D. Okla.), several plaintiffs sued Defendant CCS in connection with three deaths and one near fatality that occurred at the Tulsa County Jail.  One plaintiff died due to bowel perforation and sepsis after medical staff refused to transport him to the hospital

33

despite escalating and serious symptoms.  Another detainee died from a heart attack after complaints of chest pain were ignored for days without emergency transport.  A third detainee, who had a known history of cardiovascular problems, died after complaints of pain, nausea, and vomiting were ignored and emergency transportation, was denied.  It was alleged that "[t]here is a longstanding policy, practice or custom at the Jail of CCS/CHM/CHMO and TCSO [the jail] of refusing to send inmates with emergent needs to the hospital . . . ."

181.    In *Lara-Williams/Burke v. Glanz, et al,* 11-CV-720, an inmate named Earl Williams died after he was known to have gone days without food or water.  Mr. Williams' serious and known medical needs were ignored by CHC medical staff because there was an inappropriate 'faking or malingering' diagnosis that prevented him from receiving timely hospital care.  Expressly concluding that he was faking paralysis, the nurses recklessly ignored Mr. Williams deteriorating and dehydrated status. CHC staff moved him into a medical 'observation room' to videotape him *to prove* that his paralysis was fake – which it turned out not to have been. Before he died, staff threw food at Mr. Williams and put water just outside his reach.   It was alleged in that case that the CHC-related defendants "maintained a policy, practice, and/or custom of severely limited the use of off-site medical, mental health and diagnostic service providers, even in emergent situations, in disregard to the known, obvious and excessive risks to the health and safety of inmates."

182.    In *Layton v. Board of County Commissioners of Oklahoma County, et al*., Case No. 5:09-cv-01208-C (W.D. Okla.), Charles Holdstock died after the medical staff of a CCS-related company ignored lab results that Mr. Holdstock's kidneys were not functioning properly (and were failing to eliminate the toxic build-up of his heart medication).  Mr.

Holdstock was found unresponsive on his cell floor and later died in a hospital emergency room.

183.   In *Turley v. Correctional Healthcare Management, Inc., et al.*, Case No. 1:10-cv-02772-REB-BNB (D. Colo.), Robert Turley experienced severe pain in his throat when a piece of a sandwich became lodged in his esophagus.  He began coughing up blood and alerted the guards and medical personnel.  The nurse who evaluated him simply gave him Tylenol and advised him that he would have to wait to see the physician.  Mr. Turley became hypoxic and unconscious, and had to be taken by ambulance to the hospital where he underwent emergency surgery for an esophageal perforation.

184.   In *Estate of Bruce R. Howard, et al. v. County of El Paso, Colorado et al.*, Case No. 1:10-cv-02740-CMA-MEH (D. Colo.), Bruce Howard died of a cardiac arrhythmia after CCS staff denied him his heart medication after his arrest.  During his brief incarceration, Mr. Howard made repeated pleas to CCS medical staff for his heart medication that were ignored.  He received no treatment despite his visible shakiness and assertions that he was hallucinating.

185.   In *Moritz v. Correctional Healthcare Companies, Inc., et al.*, Case No. 4:14-cv-00656-GFK-PJC (N.D. Okla.), Michael Moritz died in the Tulsa County Jail.  CCS employees denied his repeated requests to administer his medications.  Mr. Moritz's situation became critical, and he was finally transported by ambulance to the emergency room where he remained on life support until his death.

186.   In *Guerrero v. Wichita County, Texas et al.*, Case No. 7:14-cv-0058-O (N.D. Tex.), CCS employees ignored Nicole Guerrero's obvious signs of labor and left her unattended in a solitary cell.  CCS staff then failed to transport her to the hospital for safe delivery.

The baby was purplish and in need of medical attention upon delivery, yet CCS staff did not take steps to resuscitate the newborn or administer CPR. The baby was pronounced dead shortly after birth.

187. A common thread in these cases is that CCS and related companies ignored obvious signs and symptoms to deny inmates access to necessary, emergent medical care.

188. Various governmental institutions have repeatedly made extensive reports of constitutional deficiencies in the care provided by CCS-related entities.

189. In 2007, the National Commission on Correctional Health Care ("NCCCS") auditors reported serious and systemic deficiencies in the care provided to prisoners by CCS-related companies in the Tulsa jail, including failure to triage sick calls and failure to address health needs in a timely manner.

190. In 2008, the Department of Justice found that the jail medical program, administered by a CCS-related entity, was constitutionally deficient in a number of regards. Specifically, the DOJ found problems in "providing appropriate access to medical care during emergencies" citing a case where a woman went into premature labor and delivered a baby while handcuffed to a chair rail. This happened after her complaints, including that her water had broken, were ignored. The DOJ found that there were "critical lapses in getting emergency medical care to detainees." The DOJ also noted that they had conducted a previous tour in 2003 and that, despite many years to remedy the violations found, "we generally did not observe improved conditions at the time of the second tour."

36

191.  In 2009, an Oklahoma Department of Health investigation indicated that such deficiencies by CCS-related companies continued unabated despite the abundant notice of the same from NCCCS and DOJ.

192.  In 2010, during a NCCCS audit, high-level employees of CCS attempted to fraudulently change medical records to give the appearance of compliance.  NCCCS found deficient care, deficient investigation into deaths, and a lack of timely diagnostic and specialty services.  Even after this audit, CCS did not take the corrective measures necessary to alleviate the obvious and substantial risks to inmate health.  High-level CCS employees repeatedly brought to CCS's attention the many serious deficiencies, including chronic failures to triage medical requests, falsification of records, and refusals to treat inmates with life-threatening conditions, but the corporation refused to make any changes to the way CCS-related companies operated.

193.  In November 2011, the Tulsa County Jail's own retained auditor found deficiencies in CCS's care.

194.  In 2011, U.S. Immigration and Customs Enforcement and the U.S. Department of Homeland Security's Office of Civil Rights and Civil Liberties ("CRCL") also conducted a review of the medical care provided by CCS and related companies, reporting: "CRCL found a prevailing attitude among clinic staff of indifference….", "Nurses are undertrained.  Not documenting or evaluating patients properly."

195.  Jefferson County Defendants, in contracting with CCS-related companies to provide medical care at the JCDF, would have known of these serious issues in licensure and accreditation of CCS-related prison programs, the findings of multiple governmental agencies, and refusals by CCS to correct deliberately indifferent policies.  Therefore,

37

Jefferson County Defendants are liable for the selection of CCS to provide medical services.

196.   Jefferson County Defendants also have a non-delegable duty to provide constitutionally sufficient medical care to inmates and detainees.

197.   CCS Defendants and Jefferson County Defendants had all of the above-described knowledge and notice prior to Ms. Lobato's deliberately indifferent treatment and injuries, which were the result of longstanding, systemic deficiencies in the medical care provided to inmates by CCS, as well as the widespread company policy of refusing to send inmates with emergency medical needs to the hospital or other off-site providers.

198.   CCS Defendants and Jefferson County Defendants ratified the constitutional violation by the individual Defendants by failing to administer any discipline.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### Fourteenth Amendment; Failure to Provide Medical Care and Treatment
### (Estate of Lobato Against All Individual Defendants)

199.   Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth therein.

200.   At all times relevant to the allegations in this Complaint, Defendants under color of state law.

201.   Ms. Lobato was a citizen of the United States and all of the individual Defendants are persons under 42 U.S.C. § 1983.

202.  Ms. Lobato had a clearly established right under the Fourteenth Amendment to the U.S. Constitution to be free from deliberate indifference to her known serious medical needs.

38

203.  Each individual Defendant knew or should have known of this clearly established right at the time of Ms. Lobato's death.

204.  At all times relevant to the allegations in this Complaint, each individual Defendant knew of and disregarded the excessive risks associated with Ms. Lobato's serious and life-threatening medical condition.

205.  Nevertheless, with deliberate indifference to Ms. Lobato's constitutional right to adequate medical care, as provided by the Due Process Clause of the Fourteenth Amendment to the United States Constitution, Defendants knowingly failed to examine, treat, and/or care for Ms. Lobato's worsening condition.  They did so despite their knowledge of Ms. Lobato's serious medical needs, thereby placing her at risk of serious physical harm, including death.  Therefore, Defendants knew or were aware that Ms. Lobato faced a substantial risk of harm and disregarded this excessive risk by failing to take measures to reduce it.

206.  When Ms. Lobato, and others acting on her behalf, alerted each individual Defendant to her need for medical assistance, Defendants acted with deliberate indifference to Ms. Lobato's readily apparent need for medical attention and her constitutional rights by refusing to obtain and provide any medical treatment for her.

207.  All of the deliberately indifferent acts of each individual Defendant were conducted within the scope of their official duties and employment.

208.  The acts or omissions of each individual Defendant were the legal and proximate cause of Ms. Lobato's death.

209.    The acts and omissions of each individual Defendant caused Ms. Lobato damages in that she suffered extreme physical and mental pain while she was in Defendants' custody for approximately twenty-four hours.

210.    The intentional actions or inactions of each individual Defendant as described herein intentionally deprived Ms. Lobato of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, and caused her other damages.

## SECOND CLAIM FOR RELIEF[2]

**42 U.S.C. § 1983**
**Fourteenth Amendment; Entity Liability**
**(Estate of Lobato Against Defendant Shrader in his official capacity, Jefferson County, CCS, and CHC)**

211.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

212.    Defendant Shrader is a person within the meaning of 42 U.S.C. § 1983.

213.    Jefferson County Defendants and CCS Defendants are persons within the meaning of 42 U.S.C. § 1983.

214.    At all times relevant to the allegations in this Complaint, Defendant Shrader and Jefferson County Defendant were acting under color of state law and had a non-delegable duty to provide constitutionality adequate medical care for inmates.

---

[2]  Plaintiffs intend to argue that the 10th Circuit case *Smedley v. Corr. Corp. of Am.*, 175 F. App'x 943, 946 (10th Cir. 2005) was wrongly decided and that respondeat superior should apply to private entities, such as CCS, in § 1983 actions. *See Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 795 (7th Cir. 2014) ("For all of these reasons, a new approach may be needed for whether corporations should be insulated from respondeat superior liability under § 1983. Since prisons and prison medical services are increasingly being contracted out to private parties, reducing private employers' incentives to prevent their employees from violating inmates' constitutional rights raises serious concerns. Nothing in the Supreme Court's jurisprudence or the relevant circuit court decisions provides a sufficiently compelling reason to disregard the important policy considerations underpinning the doctrine of respondeat superior. And in a world of increasingly privatized state services, the doctrine could help to protect people from tortious deprivations of their constitutional right.")

215. At all times relevant hereto CCS Defendants were willful participants in a joint activity and acting under color of state law, as the functional equivalent of a municipality providing medical care to inmates.

216. The intentional acts or omissions of Defendant Shrader, Jefferson County Defendant, and CCS Defendants were conducted within the scope of their official duties and employment.

217. CCS Defendants' and Jefferson County's deliberately indifferent and unconstitutional policies, customs, and/or practices regarding opiate withdrawal and provision of constitutionally adequate medical care as described were the moving and proximate cause of Ms. Lobato's injuries and death.

218. CCS Defendants, Jefferson County Defendant and Defendant Shrader deliberately indifferently failed to properly train and supervise their employees to provide necessary medical care to detainees at the JCDF.

219. The failures in training, supervision and policy regarding providing necessary medical assessment and care was so obvious that the failure to provide the same was deliberately indifferent to the rights of the relevant public.

220. CCS Defendants', Jefferson County and Defendant Shrader's deliberately indifferent customs, and failures to train/supervise, are all actionable policy decisions that were moving forces and proximate causes of the violation of Ms. Lobato's constitutional rights.

221. The policies, customs, and practices of CCS Defendants, Jefferson County and Defendant Shrader as described herein were also moving forces in and proximate causes of the deprivation of Ms. Lobato's right to due process and of the rights, privileges,

41

liberties, and immunities secured by the Constitution of the United States of America, and caused Plaintiffs other damages.

222. The County is also directly liable for its own policies and actions that are moving forces in this constitutional injury under the contract between Jefferson County and private CCS Defendants, as the County was the entity that participated in negotiating and sponsoring this contract despite the knowledge of this company's pervasive pattern of civil rights violations.

## THIRD CLAIM FOR RELIEF

### Medical Negligence Causing Wrongful Death
**(By Living Plaintiffs against CCS Defendants and against Caroline Ryan, Brianna Whinnery, Jessica Romero, Bryan Muscutt and Esme Ziegelmann)**

223. Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

224. CCS Defendants are private corporations that contract with Jefferson County to provide medical care and health services to inmates at the JCDF.

225. Defendants Caroline Ryan, Brianna Whinnery, Jessica Romero, Bryan Muscutt and Esme Ziegelmann are private individuals, and not public officials or employees.

226. CCS Defendants and Defendants Caroline Ryan, Brianna Whinnery, Jessica Romero, Bryan Muscutt and Esme Ziegelmann are therefore not entitled to any immunity under the CGIA.

227. At all times relevant to this action, Ms. Lobato was under the medical responsibility, care, and treatment of CCS Defendants.

228.   Defendants Caroline Ryan, Brianna Whinnery, Jessica Romero, Bryan Muscutt, Esme Ziegelmann and other care providers had a duty to provide reasonable medical care and treatment to detainees at the JCDF, including Ms. Lobato.

229.   Defendants CCS had the duty to exercise reasonable care in the training and supervision of their employees.

230.   These duties of care are informed by state law.  Under C.R.S. § 16-3-401, "prisoners arrests or in custody shall be treated humanely and provided with adequate food, shelter, and, if required, medical treatment." The provision of adequate medical treatment and humane care is a statutory obligation.

231.   Through their actions and omissions, Defendants Caroline Ryan, Brianna Whinnery, Jessica Romero, Bryan Muscutt, Esme Ziegelmann and other care providers breached their duty of care when they knowingly failed to assess, monitor, treat and care for Ms. Lobato, despite that fact that she was in obvious need of immediate medical attention.

232.   Defendants Caroline Ryan, Brianna Whinnery, Jessica Romero, Bryan Muscutt and Esme Ziegelmann had nurse-patient or EMT-patient relationships with Ms. Lobato at all relevant times and were acting within the scope of their employment throughout the duration of these relationships.

233.   With respect to their care and treatment of Ms. Lobato, Defendants Caroline Ryan, Brianna Whinnery, Jessica Romero, Bryan Muscutt and Esme Ziegelmann owed her a duty to exercise the degree of care, skill, caution, diligence, and foresight exercised by and expected of medical personnel in similar situations.  Defendants Caroline Ryan, Brianna Whinnery, Jessica Romero, Bryan Muscutt and Esme Ziegelmann breached that

standard of care and were negligent in failing to properly assess, monitor, treat, and care for Ms. Lobato.

234.  As a direct and proximate result of Defendants' Caroline Ryan, Brianna Whinnery, Jessica Romero, Bryan Muscutt and Esme Ziegelmann having breached their duty to provide reasonable medical care and treatment to Ms. Lobato, she suffered significant physical and mental pain and suffering, and other damages, and ultimately died as a result.

235.  The CCS Defendants are vicariously liable for the negligent acts and omissions by their agents and/or employees, including, but not limited to, those named individually herein, and those directly liable for their own negligent failures in training, policies, and practices.

236.  CCS Defendants are also directly liable as they breached their duty to exercise reasonable care in the training and supervision of their employees and agent in a manner that provided the detainees under their care with reasonable medical care and treatment.

237.  CCS Defendants knew or should have known of the lack of supervision, experience, and training among their employees and agents was likely to harm JCDF detainees in need of medical care, including Ms. Lobato.

238.  In failing to exercise reasonable care in the training and supervision of their employees and agents, as it relates to their providing reasonable medical care and treatment, CCS Defendants were negligent and proximately caused Ms. Lobato's death.

239.  The negligent acts and omissions by these Defendants were a substantial and significant contributing proximate cause of the death of Ms. Lobato.

240.   As a result of the complained of negligence, Plaintiffs hereto have suffered damages, losses and injuries in an amount to be determined by the jury at trial. These damages include, *inter alia*, pain and suffering, upset, grief, loss of society and companionship, anger, depression, and all other purely non-economic damages as allowed under the Colorado Wrongful Death Act.

241.   Plaintiffs suffered and continue to suffer economic and non-economic damages due to Defendants' negligent conduct toward the wife/mother of Plaintiffs, including, but not limited to, funeral expenses and financial losses due to the financial benefits they would have reasonably been expected to receive from their wife/mother had she lived, and non-economic damages for grief, loss of their wife/mother's companionship, impairment in the quality of their lives, inconvenience, pain and suffering, and extreme emotional distress. Plaintiffs hereto are therefore entitled to general and compensatory damages for such pain and suffering and emotional distress and to special damages.

242.   Defendants' conduct was attended by circumstances of malice, or willful and wanton conduct, which Defendants must have realized was dangerous, or that was done recklessly, without regards to the consequences to Ms. Lobato and the Plaintiffs.

243.   Defendants consciously disregarded a substantial and unjustifiable risk that they knew or should have known would cause the death of another.

## FOURTH CLAIM FOR RELIEF

### Negligence in the Operation of a Jail Resulting in Wrongful Death
### (Living Plaintiffs against, Defendants Curtis, Spaich (Hatch), Gray, Robbins, Longshore, and Wheeler)

244.   Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

45

245.   Pursuant to the CGIA, governmental immunity is waived for any action for injuries by a pre-trial detainee resulting from the negligent operation of any correctional facility or jail. There is also no immunity for conduct by individual law enforcement officers that is willful and wanton. *See* C.R.S. §§ 24-10-106(1)(b) and 24-10-118.

246.   Ms. Lobato was being held on allegations that had not been adjudicated and was a pre-trial detainee.

247.   The operation of a correctional facility includes the adequate provision of medical care necessary for basic health for purposes of the CGIA.

248.   Defendants Curtis, Spaich (Hatch), Gray, Robbins, Longshore, and Wheeler are therefore not entitled to immunity under the CGIA.

249.   In the performance of their duties, the deputies who participated in Ms. Lobato's detention had a duty to not act in a manner that created an unreasonable risk of injury or damage to Ms. Lobato's life or property.

250.   As described above, Defendants Curtis, Robbins, Wheeler, Longshore, Hatch, and Gray negligently and willfully and wantonly committed acts and omissions, including, but not limited to, the following, each of which contributed to creating an unreasonable risk of injury or damage to life or property:

   a.   failing to call for medical personnel soon after Ms. Lobato's arrival in Unit 6A;

   b.   failing to adequately check on Ms. Lobato during their shifts;

   c.   failing to ensure that medical attention was provided to Ms. Lobato in a timely fashion.

251.   At all relevant times, Defendants Curtis, Spaich (Hatch), Gray, Robbins, Longshore, and Wheeler were acting within the scope of their employment.

252.  As a direct and proximate result of Defendants Curtis, Spaich (Hatch), Gray, Robbins, Longshore, and Wheeler's breach of their duty to provide reasonable care and treatment to Ms. Lobato in the operation of a jail, including but not limited to, exercising their duty to obtain necessary medical care and timely monitor her condition.

253.  These Defendants knew or should have known of the lack of supervision, experience, and training among their employees and agents was likely to harm JCDF detainees in need of medical care, including Ms. Lobato.

254.  In failing to exercise reasonable care in the training and supervision of their employees and agents, as it relates to their providing reasonable supervision of inmates and detainees, these Defendants were negligent and proximately caused Ms. Lobato's death.

255.  The negligent acts and omissions by these Defendants were a substantial and significant contributing proximate cause of the death of Ms. Lobato.

256.   Individual Defendants' conduct, including the omissions, complained of herein constitutes willful and wanton conduct.

257.  As a result of the complained of negligence, Plaintiffs hereto have suffered damages, losses and injuries in an amount to be determined by the jury at trial. These damages include, *inter alia*, pain and suffering, upset, grief, loss of society and companionship, anger, depression, and all other purely non-economic damages as allowed under the Colorado Wrongful Death Act.

258.  Plaintiffs suffered and continue to suffer economic and non-economic damages due to Defendants' negligent and willful and wanton conduct toward the wife/mother of Plaintiffs, including, but not limited to, funeral expenses and financial losses due to the financial benefits they would have reasonably been expected to receive from their

wife/mother had she lived, and non-economic damages for grief, loss of their wife/mother's companionship, impairment in the quality of their lives, inconvenience, pain and suffering, and extreme emotional distress. Plaintiffs hereto are therefore entitled to general and compensatory damages for such pain and suffering and emotional distress and to special damages.

### FIFTH CLAIM FOR RELIEF
### Survival
### (Against all Defendants)

259. Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

260. Plaintiffs are the heirs of the Estate of Jennifer Lobato.

261. As a result of the deliberate indifference and/or negligence of Defendants as described above, Plaintiffs have suffered injuries and damages, including, but not limited, to funeral expenses, emotional distress and pain and suffering, and loss of enjoyment of life.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, and grant:

(a) All appropriate relief at law and equity;

(b) Declaratory relief and other appropriate equitable relief;

(c) Economic losses on all claims allowed by law;

(d) Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

48

(e) Punitive damages on all claims allowed by law and in an amount to be determined at
trial;[3]

(f) Attorneys' fees and costs associated with this action, including expert witness fees, on all
claims allowed by law;

(g) Pre- and post-judgment interest at the highest lawful rate; and

(h) Any further relief that this Court deems just and proper; and any other relief as allowed
by law.

PLAINTIFFS HEREBY DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE

Dated this 15th day of APRIL, 2016.


KILLMER, LANE & NEWMAN, LLP

s/ David Lane
David A. Lane
Michael Fairhurst
KILLMER, LANE & NEWMAN, LLP
1543 Champa Street, Suite 400
Denver, CO 80202
(303) 571-1000
dlane@kln-law.com
mfairhurst@kln-law.com

ATTORNEYS FOR PLAINTIFFS PAUL MONTOYA, J.M.,
A.Z., V.M. AND I.F.

Erica T. Grossman
Anna Holland Edwards
HOLLAND, HOLLAND EDWARDS & GROSSMAN, PC
1437 High Street
Denver, CO  80218
303-860-1331

---

[3] Plaintiffs do not currently seek punitive damages against any public employees on their state
law claims for negligence in the operation of a jail or willful and wanton conduct by such public
employees.

anna@hheglaw.com
erica@hheglaw.com

ATTORNEYS FOR PLAINTIFF ANGELICA DELGADO


Michael P. Bahr, Esq.
Bahr & Kreidle
2596 W. Alamo Ave.
Littleton, CO  80120
**303-794-7422**
mbahr@qwestoffice.net

ATTORNEYS FOR PLAINTIFFS L.F. AND A.F.

50