IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 15-cv-02718-PAB-STV

ESTATE OF JENNIFER LOBATO, by and through its personal representative Paul
Montoya,
PAUL MONTOYA, individually,
ANGELICA DELGADO,
A.Z., a minor, by and through his father, Paul Montoya,
J.M., a minor, by and through her father, Paul Montoya,
V.M., a minor, by and through her father, Paul Montoya,
L.F., a minor, by and through his father, Luciano Fresquez,
A.F., a minor, by and through her father, Luciano Fresquez, and
I.F., a minor, by and through his father, Luciano Fresquez,

      Plaintiffs,

v.

CORRECT CARE SOLUTIONS, LLC,
CORRECTIONAL HEALTHCARE COMPANIES, INC.,
JEFFERSON COUNTY, COLORADO,
JESSICA ROMERO, in her individual capacity,
CAROLINE RYAN, in her individual capacity,
BRIANNA WHINNERY, in her individual capacity, and
ESME ZIEGELMAN, in her individual capacity,

      Defendants.

---

## ORDER

---

     This matter is before the Court on Defendants CCS and CHC's Partial Motion to

Dismiss the Second Claim of Plaintiffs' Third Amended Complaint [Docket No. 117].

The Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## I. BACKGROUND[1]

     On March 2, 2015, Jennifer Lobato died as a result of untreated withdrawal from

methadone while detained in the Jefferson County Detention Facility in Jefferson

---

    [1]The facts below are taken from plaintiffs' third amended complaint, Docket No.
109, and are presumed to be true for purposes of this motion to dismiss.

County, Colorado ("JCDF").  Docket No. 109 at 28-29, ¶¶ 147, 152-54.  Plaintiffs are

Ms. Lobato's husband, her children, and the estate of Ms. Lobato.  *Id.* at 9, ¶¶ 16-17.

Ms. Lobato was arrested on March 1, 2015 for allegedly shoplifting.  *Id.* at 11, ¶ 55.

While being transported to JCDF, Ms. Lobato told Officer Wendy Trentaz of the

Lakewood Police Department that "she was a heroin user and that she was concerned

about going to jail because of her fear of withdrawing from the drug."  *Id.,* ¶ 56.

Ms. Lobato arrived at JCDF at around 5:00 p.m. on March 1, 2015 for booking

and processing.  *Id.* at 13, ¶ 72.  During the booking process, Emergency Medical

Technician ("EMT") Jessica Romero and EMT Bryan Muscutt performed an intake on

Ms. Lobato.  *Id.* at 14, ¶ 79.  Romero and Muscutt were employed by the CCS

defendants.[2]  *Id.* at 8, ¶¶ 37-38.  The CCS defendants contract with Jefferson County to

provide medical care to inmates and detainees at JCDF.  *Id.* at 11, ¶ 57.  The purpose

of the intake process is "to determine whether an inmate needs medical attention."  *Id.*

at 14, ¶ 79.  Romero and Muscutt both stated that, during the intake process, "Ms.

Lobato never admitted to any drug use and did not exhibit signs of withdrawal."  *Id.*

The CCS defendants' policy requires that, "if an inmate affirmatively confirms

drug usage or exhibits any signs of withdrawal," the medical staff is required to initiate

the opiate withdrawal protocol.  *Id.*, ¶ 80.  The opiate withdrawal protocol requires the

EMT staff to check the inmate's vital signs and for a nurse to screen the inmate for

---

[2]Correctional Healthcare Companies, Inc. ("CHC") was operating in Colorado as a provider of jail medical services through 2014, when it was merged with or was acquired by Correct Care Solutions, LLC ("CCS").  Docket No. 109 at 11-12, ¶¶ 58-61. CCS and CHC hold themselves out as a combined company.  *Id.* at 12, ¶ 63.  For the sake of brevity, the Court refers to CCS and CHC collectively as the "CCS defendants."

"clinical indications of withdrawal."  *Id.*, ¶ 81.  Plaintiffs allege that, although "Ms. Lobato was showing visible signs of withdrawal, including but not limited to sweating and shaking, JCDF's written opiate withdrawal protocol was ignored by EMT Romero and EMT Muscutt and Ms. Lobato was never screened for any clinical indications of withdrawal."  *Id.* at 14-15, ¶ 82.  Ms. Lobato was then placed in a cell in Unit 6A.  *Id.* at 15, ¶ 84.

At approximately 8:30 a.m. on March 2, 2015, Nurse Caroline Ryan, another employee of the CCS defendants, *id.* at 9, ¶ 39, conducted her morning medication disbursement to the inmates in Unit 6A.  *Id.* at 17, ¶ 94.  Numerous inmates attempted to inform Nurse Ryan about plaintiff's withdrawal symptoms, but Nurse Ryan did not examine Ms. Lobato or take any action based on the inmates' descriptions of Ms. Lobato's symptoms.  *Id.*, ¶ 95.  Throughout the morning, Ms. Lobato and other inmates informed deputies working at JCDF that Ms. Lobato was experiencing withdrawal symptoms.  *Id.* at 16-20, ¶¶ 96-107.  Ms. Lobato informed the deputies that she was withdrawing from "meth."  *Id.* at 19, ¶ 103.  One deputy, after hearing Ms. Lobato complain about withdrawal, reviewed Ms. Lobato's intake records and spoke to EMT Romero about Ms. Lobato's intake.  *Id.* at 20, ¶ 107-08.  EMT Romero informed the deputy that Ms. Lobato had not provided any information related to withdrawal and stated that "they don't really have a protocol for meth anyway."  *Id.*, ¶ 108.  EMT Romero did not try to clarify what "meth" referred to.  *Id.*

Nurse Ryan returned to Unit 6A between 11:15 a.m. and 11:45 a.m. to do another medication distribution.  *Id.* at 20, ¶ 111.  By this time, Ms. Lobato had been

vomiting for several hours. *Id.* at 17, ¶ 97. Numerous inmates alerted Nurse Ryan that Ms. Lobato was in withdrawal, but Nurse Ryan did not evaluate Ms. Lobato or take any other actions in response to the inmates' statements. *Id.* at 21, ¶ 112. Throughout the afternoon, Ms. Lobato and the other inmates continued to inform the deputies on duty that Ms. Lobato was in withdrawal, was vomiting, and was in need of medical attention. *Id.* at 21-23, ¶¶ 113-126. Instead of providing Ms. Lobato with treatment, the deputies on duty ignored Ms. Lobato's pleas and harassed the inmates who tried to get Ms. Lobato help. *Id.* at 24-26, ¶¶ 129-133.

Nurse Ryan returned for a third time to Unit 6A at approximately 4:30 p.m. to distribute medication. *Id.* at 26, ¶ 134. One of the deputies informed Nurse Ryan that Ms. Lobato was withdrawing from "meth" and that Ms. Lobato had not mentioned this during the intake process. *Id.* Nurse Ryan stated that "they could not give any medications for meth withdrawal, and if she had her way, everyone would withdraw from meth because it was the best [drug to] withdraw from." *Id.*, ¶ 135. Nurse Ryan did not attempt to clarify the meaning of "meth," inquire about Ms. Lobato's physical condition, or attempt to examine Ms. Lobato. *Id.* at ¶ 136.

At approximately 5:00 p.m., Ms. Lobato's cellmate returned to the cell. *Id.*, at 26-27, ¶ 137. She was "overcome by the smell of vomit" and informed the deputies that "Ms. Lobato was extremely sick and needed help." *Id.* at 27, ¶ 138. The deputies instructed Ms. Lobato's cellmate to clean the cell and did not ask about Ms. Lobato's condition. *Id.* Ms. Lobato's cellmate refused to clean the cell and left. *Id.*, ¶ 139. The deputy told Ms. Lobato "that she would only receive medical attention after the cell had

4

been cleaned." *Id.*  At that time, Ms. Lobato informed one of the deputies that she was withdrawing from methadone.  *Id.* at 27, ¶ 140.  The deputy contacted Nurse Brianna Whinnery, *id.,* another employee of the CCS defendants.  *Id.* at 9, ¶ 40.  Nurse Whinnery told the deputy that Ms. Lobato would be put on the list for the evening medication rounds.  *Id.* at 27, ¶ 142.  Nurse Whinnery did not inquire as to Ms. Lobato's condition, send medical staff to evaluate Ms. Lobato, or "otherwise follow the established protocol." *Id.*  Nurse Whinnery gave Ms. Lobato's medical information, including that she was withdrawing from methadone, to Nurse Esme Ziegelman, the charge nurse for the night shift.  *Id.* at 28, ¶ 143.  Nurse Ziegelman did not attempt to get any additional information about Ms. Lobato's physical condition.  *Id.*

The medication rounds for the evening did not begin until 7:30 p.m.  *Id.*, ¶ 144.  At approximately 7:00 p.m. on March 2, 2015, Ms. Lobato pressed the intercom button in her cell and "pleaded for medical attention." *Id*. at 29, ¶ 148.  The deputies on duty told Ms. Lobato she would have to wait for the nurse's evening medication rounds.  *Id.*  At approximately 7:19 p.m., Ms. Lobato's cellmate pressed the intercom button and told the deputies that she did not think Ms. Lobato was breathing.  *Id.*, ¶ 149.  The deputies called for paramedics, who arrived at approximately 7:30 p.m.  *Id.*, ¶ 151.  At 7:45 p.m., Ms. Lobato was pronounced dead.  *Id.*, ¶ 152.  Ms. Lobato died of "cardiac arrest due to probable electrolyte abnormalities, due to repeated vomiting." *Id.*, ¶ 153.

According to an expert retained by plaintiffs, Ms. Lobato's death was preventable "by simple medical care and treatments, and even up until the immediate time of her

death, her treatments with IV fluids and electrolyte replacements would have saved her life." *Id.* at 30, ¶ 156.

The third amended complaint alleges five claims for relief: first, the estate of Ms. Lobato seeks damages against all defendants under 42 U.S.C. § 1983 for a failure to provide medical care and treatment in accordance with the Fourteenth Amendment; second, the estate of Ms. Lobato seeks damages against the CCS defendants and Jefferson County under 42 U.S.C. § 1983; third, plaintiffs Paul Montoya, Angelica Delgado, A.Z., J.M., V.M., L.F., A.F., and I.F. seek damages against the CCS defendants, Caroline Ryan, Brianna Whinnery, Jessica Romero, and Esme Ziegelman for medical negligence causing wrongful death; fourth, plaintiffs Paul Montoya, Angelica Delgado, A.Z., J.M., V.M., L.F., A.F., and I.F. seek damages for negligent operation of the jail resulting in the wrongful death of Ms. Lobato[3]; and fifth, all plaintiffs seek damages from all defendants as heirs to Ms. Lobato's estate. Docket No. 109 at 38-48, ¶¶ 199-261.

The CCS defendants have moved to dismiss plaintiffs' second claim for relief. Docket No. 117.

## II.  LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege enough factual matter that, taken as true, makes the plaintiffs' "claim to relief . . . plausible on its face." *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008) (citing

---

[3]While plaintiffs' second amended complaint presents five claims for relief, plaintiffs' fourth claim, for negligence in the operation of a jail resulting in wrongful death, Docket No. 109 at 45, was brought only against defendants who have since been dismissed from this case.  *See* Docket No. 142.

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "[W]here the well-pleaded facts

do not permit the court to infer more than the mere possibility of misconduct, the

complaint has alleged – but it has not shown – that the pleader is entitled to relief."

*Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (internal quotation marks and alteration

marks omitted).  Thus, even though modern rules of pleading are somewhat forgiving,

"a complaint still must contain either direct or inferential allegations respecting all the

material elements necessary to sustain a recovery under some viable legal theory."

*Bryson,* 534 F.3d at 1286 (alteration marks omitted).

## III. ANALYSIS

Plaintiffs' second claim for relief is based on a theory of entity liability.  "Local

governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or

injunctive relief where . . . the action that is alleged to be unconstitutional implements or

executes a policy statement, ordinance, regulation, or decision officially adopted and

promulgated by that body's officers."  *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S.

658, 690 (1978) (footnote omitted).  While *Monell* explicitly applies to municipal

governments, the Tenth Circuit has extended the *Monell* doctrine to private entities

acting under color of state law.  *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1216 (10th

Cir. 2003) (citations omitted).  An entity like CCS, however, "cannot be held liable solely

because it employs a tortfeasor – or, in other words . . . cannot be held liable under

§ 1983 on a respondeat superior theory."[4]  *Id.* (quoting *Monell*, 436 U.S. at 691).  "[T]o

_____

[4]The third amended complaint states that "[p]laintiffs intend to argue that the 10th Circuit case *Smedley v. Corr. Corp. of Am.*, 2005 WL 3475806 (10th Cir. 2005) (unpublished), was wrongly decided and that respondeat superior should apply to private entities."  Docket No. 109 at 40 n.2.  Plaintiffs acknowledge that current

hold the entity liable, the plaintiff must identify an official policy or a custom that is the 'direct cause' or 'moving force' behind the constitutional violations." *Aguilar v. Colorado State Penitentiary*, 656 F. App'x 400, 403 (10th Cir. 2016) (unpublished) (quoting *Dubbs*, 336 F.3d at 1215).  The plaintiff must show that "the policy was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013). "The deliberate indifference standard may be satisfied when the [entity] has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998) (citation omitted).

A municipal policy or custom can take the form of "(1) a formal regulation or policy statement; (2) an informal custom amoun[ting] to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions – and the basis for them – of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from

---

precedent "weighs against a claim based on *respondeat superior* liability" and do not rely on such a theory to survive the motion to dismiss.  Docket No. 122 at 9 n.4.  To the extent plaintiffs did rely on such a theory, dismissal would be appropriate in light of *Smedley*, 175 F. App'x at 946 ("The Tenth Circuit, along with many of our sister circuits, has rejected vicarious liability in a § 1983 case for private actors based upon Monell.").

'deliberate indifference' to the injuries that may be caused." *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (citations omitted).

The Court applies the requirements of culpability and causation rigorously. *Cacioppo v. Town of Vail, Colo.*, 528 F. App'x 929, 931 (10th Cir. 2013) (unpublished) ("[W]here a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into respondeat superior liability.") (quoting *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 415 (1997)).  "The causation element is applied with especial rigor when the municipal policy or practices is itself not unconstitutional, for example, when the municipal liability claim is based upon inadequate training, supervision, and deficiencies in hiring." *Schneider*, 717 F.3d at 770.

The third amended complaint makes allegations under several *Bryson* categories.  Plaintiffs allege that the CCS defendants maintained "unconstitutional policies, customs, and/or practices regarding opiate withdrawal and provision of constitutionally adequate medical care."  Docket No. 109 at 41, ¶ 217.  Further, plaintiffs allege that the defendants "failed to properly train and supervise their employees to provide necessary medical care to detainees at the JCDF." *Id.*, ¶ 218. Additionally, plaintiffs allege that the CCS defendants "ratified the constitutional violation by the individual Defendants by failing to administer any discipline." *Id.* at 38, ¶ 198.

A plaintiff cannot rely on a hybrid theory of entity liability, alleging elements of multiple *Bryson* categories, but failing to fully develop any.  *See Cacioppo*, 528 F. App'x

9

at 934 ("The potential breadth of the hybrid theory that [plaintiff] advances – which would elide the substantive weaknesses of proof of any particular theory of municipal liability just so long as all three theories in the aggregate revealed a constitutional violation by the municipality – would be at odds with the Court's conservative, restrictive approach regarding the individual theories of liability.")  Instead, to proceed on any of the three aforementioned theories, plaintiffs must sufficiently allege each element of the relevant theory.

### A.  Unconstitutional Custom, Policy, or Practice

The third amended complaint states that the "unconstitutional policies, customs, and/or practices regarding opiate withdrawal and provision of constitutionally adequate medical care . . . were the moving and proximate cause of Ms. Lobato's injuries and death."  Docket No. 109 at 41, ¶ 217.  Plaintiffs allege several policies in the third amended complaint: the opiate withdrawal policy, *id.* at 31, ¶ 166;  the "company policy of refusing to send inmates with emergency medical needs to the hospital," *id.* at 38, ¶ 197; a policy of "using nurses to provide provider level diagnoses and evaluation, including to rule out serious medical conditions," *id.*, at 31, ¶ 168; the training of medical staff to adopt a "wait and see approach, without meaningful or appropriate evaluation," *id.* at 31, ¶ 164; and the "policy, practice, and widespread custom of knowingly disregarding the risk of even serious medical needs of inmates by jail nurses."[5]  *Id.* at 31, ¶ 167.

---

[5]The third amended complaint states one additional alleged policy: that the CCS defendants had a policy or practice of knowingly disregarding medical needs.  Docket No. 109 at 41, ¶ 217.  This conclusory statement does not describe a formal CCS policy and, therefore, does not state a claim.

As to the CCS defendants' opiate withdrawal policy, the third amended complaint fails to allege facts suggesting that this policy was a cause of Ms. Lobato's death. Instead, plaintiffs state that defendant CCS's policy required "initiation of the opiate withdrawal protocol . . . if an inmate affirmatively confirms drug usage or exhibits any signs of withdrawal," Docket No. 109 at 14, ¶ 80, and that the "withdrawal protocol was ignored by EMT Romero and EMT Muscutt." *Id.* at 14-15, ¶ 82. Similarly, after learning that Ms. Lobato was withdrawing from methadone, Nurse Whinnery allegedly failed to "follow the established protocol." *Id.* at 27, ¶ 142. Plaintiffs' allegations do not support an inference that the opiate withdrawal policy caused Ms. Lobato's death. The third amended complaint does not allege that the CCS defendants' opiate withdrawal policy was deficient. Instead, the third amended complaint alleges that, if the CCS employees had followed the established protocol, Ms. Lobato's death could have been prevented. *Id.* at 11, ¶¶ 52-53; 14, ¶ 80; 27, ¶ 142; 30, ¶ 156.

Similarly, the CCS defendants' policy of refusing to send inmates to off-site hospitals cannot be said to have caused Ms. Lobato's death. Plaintiffs' medical expert indicates that Ms. Lobato's death was preventable "by simple medical care and treatments," *id.* at 30, ¶ 156, which does not plausibly suggest that her death could only have been prevented by off-site treatment. Moreover, the CCS defendants' policy of using nurses to diagnose inmates has no causal link to Ms. Lobato's death since plaintiffs allege that no nurse, or other CCS employee, ever examined, diagnosed, or treated Ms. Lobato. *See id.* at 17, ¶ 95; 20-21, ¶¶108, 112; 27-28, ¶¶ 142-43.

The third amended complaint also states that the CCS defendants adopted a "wait and see" approach to medical treatment. *Id.* at 31, ¶ 164. Plaintiffs' factual allegations, however, do not suggest that this policy was a plausible cause of Ms. Lobato's death. The facts do not suggest that the CCS nurses declined to provide Ms. Lobato with medical care until her symptoms were sufficiently severe. Instead, the nurses scheduled Ms. Lobato to receive treatment in the ordinary course of their rounds and did not examine Ms. Lobato, inquire about her condition, or otherwise investigate whether she required emergency treatment. *See*, *id.* at 27, ¶ 142. The third amended complaint does not make factual allegations that make it plausible that the nursing staff delayed Ms. Lobato's treatment until she got worse.

In their response to the motion to dismiss, plaintiffs argue that the "wait and see" approach allegedly adopted by the CCS defendants is financially motivated. Docket No. 122 at 9. The fact that Ms. Lobato was scheduled for treatment and the averment that the opiate withdrawal protocol was mandatory belies the plausibility of plaintiffs' allegation that the CCS defendants were avoiding financial costs by failing to treat Ms. Lobato. Docket No. 122 at 9. The third amended complaint does not allege facts related to either the existence of a financially motivated "wait and see" policy or facts suggesting that this policy caused Ms. Lobato's death.

Plaintiffs also argue in their response that,

> [t]he alleged actions of the individual defendants employed by CCS/CHC singlehandedly state a claim against the CCS Defendants because these four individuals had an extended opportunity to do better but consistently responded in a constitutionally deficient manner to Ms. Lobato's serious and obvious medical needs. The individual Defendants' pattern of unconstitutional conduct therefore shows that the CCS Defendants' customs and practices are illegal as well.

12

Docket No. 122 at 7.  As factual support for this theory, plaintiffs cite various paragraphs of the third amended complaint which they claim show that the CCS defendants were "driven by CCS/CHC's challenged training and customs." *Id.* at 8. This theory attempts to lay out the requirements for "single incident" *Monell* liability because it draws only on the events surrounding the death of Ms. Lobato, not the formal policies or customs maintained by the CCS defendants.  Later in their response, plaintiffs explicitly discuss single-incident liability, stating

> [t]he individual private Defendants' sustained and willful failure to even properly assess Ms. Lobato's increasingly severe medical condition . . . shows CCS/CHC's deliberate indifference because the injuries Ms. Lobato ultimately suffered were a "plainly obvious consequence" of its inadequate training and supervision.

*Id.* at 13.

The single incident described in the third amended complaint does not create a plausible inference that the CCS defendants maintained an unconstitutional policy, practice, or custom.  A single incident can evince a policy, practice, or custom where the "particular illegal course of action was taken pursuant to a decision made by a person with authority to make policy decisions on behalf of the entity being sued." *Moss v. Kopp*, 559 F.3d 1155, 1169 (10th Cir. 2009) (citing *Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir. 1996)).  There is no allegation in the third amended complaint that the CCS employees acted pursuant to a policymaker's decision.  Accordingly, plaintiffs cannot rely on the conduct of the CCS employees surrounding this single incident to demonstrate a policy, custom, or practice.  *Id.*

In limited circumstances, a single incident may provide evidence of a failure to train employees.  In *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989), the Supreme Court stated that, because "city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons . . . the need to train officers in the constitutional limitations on the use of deadly force . . . can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights."  *Id.* at 390 n.10.  The Supreme Court therefore carved out the possibility, "however rare, that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations."  *Connick v. Thompson*, 563 U.S. 51, 64 (2011) (discussing *Harris*).

The Supreme Court, however, has stated that a single constitutional violation does not evidence a lack of training unless the violation of constitutional rights is a "highly predictable consequence" of the decision not to provide training.  *Id.*  In *Connick*, the Court explained that the *Harris* hypothetical is grounded in the fact that "[t]here is no reason to assume that police academy applicants are familiar with the constitutional constraints on the use of deadly force . . . [and] there is no way for novice officers to obtain the legal knowledge they require."  *Id.*  Accordingly, a single constitutional violation provides evidence of a failure to train only where there is reason to anticipate that a subset of municipal employees lacks specific training and that lack of training makes a constitutional violation highly predictable.

14

Plaintiffs note that substance withdrawal and medical emergencies are common medical issues in the jail setting. Docket No. 122 at 13. Nevertheless, the third amended complaint does not allege a plausible basis for the CCS defendants to anticipate that their medical staff would not be trained to respond appropriately to opiate withdrawal or to disregard the written policy on the matter. Moreover, Ms. Lobato's medical needs were "simple," Docket No. 109 at 30, ¶ 156; thus, any failure to appropriately treat Ms. Lobato cannot be described as a "highly predictable consequence" of a gap in the medical staff's training. *Connick*, 563 U.S. at 64. In the "absence of specific reason, such as a pattern of violations," the CCS defendants had no reason to believe that death from opiate withdrawal was a highly predictable consequence of a failure to train. *Id.* at 67.

None of the policies identified by plaintiffs states a claim for *Monell* liability and the circumstances of this case do not fit within the narrow exceptions for single-incident liability described in *Moss* and *Harris*.

### B.  Failure to Train

As the Tenth Circuit noted in *Bryson*, a policy or custom can take the form of "the failure to adequately train . . . , so long as that failure results from 'deliberate indifference' to the injuries that may be caused." 627 F.3d at 788. "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61. To proceed on a failure-to-train theory, plaintiff must prove "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the

15

policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir. 1996) (quoting *Harris*, 489 U.S. at 390). Only where the failure to train amounts to "deliberate indifference" can a shortcoming in training "be properly thought of as a city 'policy or custom.'" *Connick*, 563 U.S. at 61. Notice of particular deficiencies in a training program is the crux of a failure-to-train theory because "[w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.* at 61.

In addition, there must be a causal link between the failure to train and the alleged constitutional deprivation. *Harris*, 489 U.S. at 385. The causation inquiry focuses on whether "the injury [could] have been avoided had the employee been trained under a program that was not deficient in the identified respect." *Thomas v. Cumberland Cty.*, 749 F.3d 217, 226 (3d Cir. 2014) (quoting *Harris*, 489 U.S. at 391)).

The second claim alleges that the CCS defendants failed to train their employees to "provide necessary medical care to detainees." Docket No. 109 at 41, ¶ 218. Plaintiffs describe a number of lawsuits where inmates died as a result of the CCS defendants' employees failing to recognize serious medical needs. *Id.* at 32-36, ¶¶ 175-186. The cases describe a range of facts including failing to respond to multi-day complaints of chest pain where an inmate had a history of cardiovascular problems, ignoring lab results showing that an inmate's kidneys had stopped functioning, denying prescribed medication to inmates with emergent medical problems, and ignoring an inmate who went into labor in her cell. *Id.* Plaintiffs also describe reviews of CCS

facilities conducted by the Department of Justice, the National Commission on Correctional Health Care, U.S. Immigration and Customs Enforcement, and the U.S. Department of Homeland Security's Office of Civil Rights and Civil Liberties.  *Id.* at 36-37, ¶¶ 189-194.  Each of those studies identified deficiencies in the training of medical staff.  *Id.*  The CCS defendants argue that these reports and cases do not demonstrate deliberate indifference because they do not show that the CCS defendants had notice that the CCS defendants' employees were inadequately trained with respect to opiate withdrawal.  Docket No. 117 at 9-10.

As an initial matter, only one of the lawsuits described by plaintiffs, *McGill v. Correctional Healthcare Companies, Inc., et al.,* Case No. 13-cv-01080-RBJ-BNB (D. Colo.), resulted in a jury verdict.  Docket No. 109 at 32-33, ¶¶ 175-78.  The third amended complaint does not state whether the other lawsuits resulted in liability to defendants, but rather states that the plaintiffs "alleged" CCS or CHC maintained unconstitutional policies.  *See id.* at 33-36, ¶¶ 180-186.  Unsubstantiated allegations from complaints filed against the CCS defendants, without more, do not put the CCS defendants on notice that the training of their nursing staff is deficient regarding opiate withdrawal.  *See Rowley v. Morant*, 2014 WL 11430980, at *2 (D.N.M. July 14, 2014) ("[T]he mere fact that a lawsuit was filed without any mention of the disposition of the lawsuit or whether the City was found to have violated any rights does not establish a pattern and practice."); *see also Morris v. City of N.Y.*, 2013 WL 5781672, at *11 (E.D.N.Y. Oct. 28, 2013) ("The fact that two of the defendants as well as a non-defendant supervising officer have had civil suits brought against them in the past

that resulted in settlements is not even evidence of wrongdoing, let alone that the City has a custom or policy that fosters or results in wrongdoing.").

Accordingly, the *McGill* lawsuit provides the only relevant grounds for notice to the CCS defendants of their failure to train their employees.  To state a claim, plaintiffs must plausibly allege that *McGill* put the CCS defendants on notice that its employees were likely to fail to respond adequately to opiate withdrawal.  In *McGill*, the jury found that CHC had unconstitutional policies or informal practices that resulted in nurses failing to refer inmates with "subjective complaints of a serious medical condition" to doctors or to send those inmates to the hospital "until the nurse was satisfied that there was objective evidence that the inmate was probably suffering from the condition."  Docket No. 109 at 33, ¶ 176.  The third amended complaint states that "[t]he jury also found that CHC had constitutionally deficient training and supervision of nurses."  *Id.*, ¶ 177.  The third amended complaint does not describe any specific findings in *McGill* regarding the deficiency of such training.  Therefore, the allegations of the third amended complaint regarding the *McGill* jury verdict do not plausibly allege that the CCS defendants had notice of and were deliberately indifferent to the training defects that allegedly caused Ms. Lobato's death.

Assuming *arguendo* that the other lawsuits identified by plaintiffs could provide the requisite notice to the CCS defendants, none of the cases identifies a training defect relevant to the manner in which Ms. Lobato was treated.  Each of the lawsuits shows that nursing staff saw the patient and ignored emergent symptoms.  *See, e.g.,* Docket No. 109 at 33, ¶ 176 ("even if the nurse suspected that the inmate might be

suffering from a condition requiring urgent review by a doctor, the nurse would not call the on-call doctor or call 911"); 34-35, ¶ 182 ("medical staff of a CCS-related company ignored lab results"); 35, ¶ 183 ("The nurse who evaluated [the inmate] simply gave [the inmate] Tylenol and advised him that he would have to wait to see the physician").  Ms. Lobato was not evaluated by nursing staff and there is no indication in the third amended complaint that the nursing staff was made aware of her symptoms.  *See* Docket No. 109 at 27, ¶ 142 (noting that Nurse Whinnery failed to ask follow-up questions about Ms. Lobato's condition or follow the opiate withdrawal protocol).  While Ms. Lobato was seen by CCS employed EMTs, based on plaintiffs' allegations, Ms. Lobato misrepresented her condition during intake, Docket No. 109 at 14, ¶ 79, and none of the cases referenced by plaintiffs refers to either the intake process or EMT staff.  The situations described by plaintiffs do not sufficiently align with the circumstances surrounding Ms. Lobato's death.  *See Coffey v. United States*, 2011 WL 6013611, at *33 (D.N.M. Nov. 28, 2011) (noting that "the incidents [supporting a failure-to-train claim] must also be sufficiently similar to put officials on notice of the situation.")

    While the investigative reports identified by plaintiff discuss failures "in getting emergency medical care to detainees," s*ee, e.g.,* Docket No. 109 at 36, ¶ 190,  the cases and studies identified by plaintiffs do not describe failures to treat opiate withdrawal or a general failure by nursing staff to examine patients upon intake.  *Id.* at 36-38, ¶¶ 188-197.  The third amended complaint alleges that, had the CCS employees followed the opiate withdrawal protocol, Ms. Lobato would have been treated.  Docket No. 109 at 27, ¶ 142 ("Nurse Whinnery did not ask any follow up questions, immediately have someone from medical sent to see Ms. Lobato, or otherwise follow

the established protocol.").  The lawsuits and studies cited by plaintiffs do not show that

the CCS defendants were on notice that its nursing staff would fail to follow the opiate

withdrawal protocol and, in the absence of such allegations, "decisionmakers can hardly

be said to have deliberately chosen a training program that will cause violations of

constitutional rights."  *Connick*, 563 U.S. at 62.

### C.  Ratification

Defendants argue that plaintiffs cannot state a § 1983 claim against them based

on ratification because plaintiffs do not identify a policymaker who ratified the CCS

defendants' employees' conduct.  Docket No. 117 at 14.  Rather than respond to that

argument, plaintiffs state that "the involved CCS/CHC personnel . . . were not

terminated or even disciplined . . . [t]he CCS Defendants instead affirmatively chose to

take no remedial action whatsoever and give their imprimatur to the individual

Defendants' conduct."  Docket No. 122 at 15.  Failure to discipline in a specific instance

is not an adequate basis for municipal liability under *Monell*.  *Butler v. City of Norman*,

992 F.2d 1053, 1056 (10th Cir. 1993) (citing *Santiago v. Fenton*, 891 F.2d 373, 382 (1st

Cir.1989)); *see also Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 848 (5th Cir.

2009); *Garcia v. City of Imperial*, 2010 WL 3911457, at *2 (S.D. Cal. Oct. 4, 2010) ("[I]n

order for there to be ratification, there must be 'something more' than a single failure to

discipline or the fact that a policymaker concluded that the defendant officer's actions

were in keeping with the applicable policies and procedures.") (citing *Kanae v. Hodson*,

294 F. Supp. 2d 1179, 1191 (D. Hawaii 2003)).  While some after-the-fact conduct

could theoretically provide evidence of a policy, *Cordova v. Aragon*, 569 F.3d 1183,

1194 (10th Cir. 2009) (hypothesizing that a cover-up could provide evidence that the city encouraged contrary behavior), the mere failure to discipline does not demonstrate that a CCS policymaker caused Ms. Lobato's death.  "[B]asic principals of linear time prevent us from seeing how conduct that occurs after the alleged violation could have somehow caused that violation."  *Id.*

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Defendants CCS and CHC's Partial Motion to Dismiss the Second Claim of Plaintiffs' Third Amended Complaint [Docket No. 117] is granted.  It is further

**ORDERED** that plaintiffs' second claim for relief is dismissed as to defendants Correct Care Solutions, LLC and Correctional Healthcare Companies, Inc.


DATED March 30, 2017.

BY THE COURT:


  s/Philip A. Brimmer_____
PHILIP A. BRIMMER
United States District Judge