**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No:  15-cv-02718-PAB-STV

ESTATE OF JENNIFER LOBATO, et al.;

      Plaintiffs,

v.

JESSICA ROMERO, et al.;

      Defendants.

_____

**PLAINTIFFS' RESPONSE TO DEFENDANTS ROMERO'S, RYAN'S, AND
WHINNERY'S MOTION FOR PARTIAL SUMMARY JUDGMENT**
_____

Plaintiffs, through undersigned counsel, submit the following Response to Defendants

Romero's, Ryan's and Whinnery's Motion for Partial Summary Judgment [Doc. 202, filed

8/8/17], and state as follows in support:

**Response to Statement of Undisputed Material Facts ("RSUMF")**

1. Admit that Lobato was charged with – but never convicted of – the offenses described.

2. Admit that the police report so states. Thus, Lobato readily admitted to Lakewood Police

Department Officer Trentaz that she was a heroin user, clearly was worried about experiencing

withdrawal symptoms, and had no problem vocalizing her concerns or asking for help.

3. Admit in part. There were indeed written nursing protocols, procedures, and training for opiate

withdrawal in March 2015 at JCDF (including training *specifically* addressing "methadone"

withdrawal, *see* **Ex. 1**, CHC Withdrawal Management Training). While there may have been no

*written* nursing protocols explicitly addressing methamphetamine withdrawal, CCS' expectation

at JDCF was that the medical staff should clarify if the inmate is referring to

"methamphetamines" or "methadone" if an inmate reports withdrawing from "meth." **Ex. 9**,

1

Albers Interview; **Ex. 2**, Ziegelman Depo., 41:1-15 ("incumbent" on nurses two distinguish between the two). If a nurse learned that an inmate was complaining of withdrawing from "methamphetamines," it was the expectation and training of CCS for the nurse to take vital signs on the inmate and, if the vitals were abnormal, to report it immediately to the doctor on staff. *See* **Ex. 9**, Albers Interview and **Ex. 10**, Nordman Interview. Additionally, if CCS nursing staff learned an inmate was withdrawing from *any* drug/substance, they were trained to ask follow-up questions about the inmate's medical condition and to treat their medical needs. **Ex. 2**, 37:14-17; **Ex. 3**, Romero Depo., 81:10-25; *see also* **Ex. 4**, CHC Training Materials (CCS nursing staff trained to treat the *symptoms* of methamphetamine withdrawal); **RSUMF ¶** 15.

4. Admit in part. CCS nursing staff were still required to assess, monitor, and treat inmates' medical needs arising from *any* type of withdrawal. *See* **RSUMFs ¶¶** 3, 15.

5. Admit.

6. Admit only that Romero *claims* Lobato denied having recently used drugs during intake (as inmates frequently did to avoid potential criminal repercussions arising from admitted illegal drug use); Plaintiffs lack sufficient information to address what Lobato actually said at the time, but a jury may reasonably conclude that Lobato was *not* denying drug use to avoid potential criminal repercussions because she was freely telling arresting officers, who are much more likely to cause charges to be filed, than nursing staff within the jail. It simply does not make sense that she told officers and not medical workers

7. Plaintiffs lack sufficient information to address what Lobato actually said at the time, but a jury may reasonably conclude that Lobato was *not* denying drug use because she was freely telling arresting officers about her drug use.

8-9. Admit.

2

10. Admit that Lobato told Curtis and Gerlach that she did not want to go to advisements because she was not feeling well. Hatch (Spaich) heard the conversation between Curtis and Lobato, and gave Lobato a glass of water. **Ex. 5**, Spaich Depo., 25:9-15. Defendant Nurse Ryan was standing right next to Spaich during this interaction and, like Spaich, could hear Lobato report that she not feeling well.  **Ex. 21**, 2016-06-27 Spaich Final Answers to Discovery at 3). Yet, Defendant Ryan failed to ask any follow-up questions, failed to further assess Lobato, failed to make any note in Lobato's medical records indicating that she was unwell, and failed to provide or procure any medical care for Lobato at the time. **Ex. 6**, Curtis Depo., 43:1-11; **Ex. 7**, Jennifer Lobato's Medical Records.

11. Deny in part; this is a disputed issue of material fact. *See* **RSUMF** ¶ 10. Defendant Ryan was present for this interaction and also heard Lobato report that she was sick. *See id*. Plaintiffs lack sufficient information to otherwise address the veracity of Defendants' claims.

12. Admit that, while at advisements, Lobato was forthcoming in reporting that she felt sick because she was withdrawing, and that neither Wheeler nor Longshore reported this to medical staff at the time.

13. Admit that, after returning from advisements, Lobato was again forthcoming in reporting that she felt sick because she was withdrawing, and further voluntarily disclosed to Curtis that she was withdrawing from "meth."

14. Admit in part. Curtis called Defendant Romero and told Romero that Lobato at least[1] reported that she was withdrawing from meth. Romero responded merely by checking Lobato's

---

[1] At different times, Romero has both admitted and denied that Curtis further stated to her that Lobato should be on a lower level, lower bunk because she was withdrawing from meth; this creates a hotly-disputed factual question regarding Romero's credibility that a jury must resolve because one of Romero's sworn statements regarding this material fact must be false. *Compare* **Ex. 8**, Romero Interview *with* **Ex. 3**, 40:20-42:10.

intake chart and relaying to Curtis that Lobato did not indicate any drug use or withdrawal during intake. Thus, even though Romero now knew that Lobato not only was withdrawing but also that Lobato was withdrawing from "meth," Romero failed to ask any follow-up questions about Lobato's medical condition or reported drug use, **Ex. 3**, 52:11-18, including but not limited to the obviously critical question of whether "meth" meant methamphetamines or methadone (CCS had a withdrawal protocol for opiates that should have been immediately initiated for Lobato, *see* **RSUMF** ¶ 3), and obviously critical questions related to potential withdrawal-related symptoms Lobato was displaying (CCS medical personnel were expected to evaluate and treat the symptoms arising from any withdrawal, *see id.*), all in direct contravention of her training provided by CCS, *see id.* Romero also failed to contact any medical personnel to notify them that Lobato was in fact withdrawing from "meth," failed to ask any medical personnel to immediately check on Lobato, and failed to update Lobato's medical records to reflect that she was withdrawing from "meth" and sick despite having the ability and duty to do so because Lobato's medical condition had been incorrectly entered during intake (there was no notation for withdrawal or drug use). **Ex. 3**, 51:22-52:10, 62:5-14, 65:16-66:10, 67:4-68:8. Romero admitted that she believed at the time that Lobato was falsely reporting her medical condition to "get something" out of it, despite lacking a shred of evidence besides her apparent mistrust of all inmates to support her deliberately indifferent dismissal of Lobato's real and serious complaints. *See* **Ex. 3**, 60:10-61-4. This diagnosis of malingering by an EMT untrained and unlicensed to make such diagnoses was grossly reckless.

15. Admit only that Romero was not told at the time that Lobato vomited *because she chose not to ask any follow-up questions* about Lobato's medical condition and *chose not to inform any other nurse about Lobato's medical condition* despite learning that Lobato was

withdrawing from "meth," **RSUMF** ¶ 14, even though it was Romero's job as an onsite medical professional to get to the bottom of whether a withdrawing inmate is vomiting (in contrast, deputies generally are just expected to report inmates' observed medical condition and self-reported complaints to medical personnel unless presented with a medical emergency in an acute, life-threatening situation, **Ex. 11**, Gray Depo., 40:18-42:25,) and even though CCS had trained Romero that opioid withdrawal[2] including methadone withdrawal can lead to vomiting, that vomiting can lead to dehydration, that dehydration can lead to death, that dehydration can be easily treated if it is promptly addressed, and that *all types of* withdrawal can be fatal if improperly treated, *see* **Ex. 12**, Whinnery Depo., 21:1-15, 23:20-25:12, *see also* **Ex. 20**, CHC PowerPoint Training Materials (Bates No. 20 states: "Why do we care about opiate withdrawal? It can lead to dehydration; a condition that is potentially life threatening!") (emphasis in original). Moreover, Romero knew based on her medical training that Lobato likely was vomiting because Romero knew Lobato was withdrawing from "meth." *See* **RSUMFs** ¶¶ 3-4. Any lack of knowledge by Romero regarding this symptom came in the form of willful refusal to ascertain Lobato's medical condition despite knowing it could likely be serious and life threatening.

16. Admit Ryan conducted a "med pass" at about 4:15-30 p.m. for inmates in module 6, which is the module where Lobato was located, *see* **RSUMF** ¶ 8; *see also* **Ex. 13**, Ryan Depo., 102:16-23.

17. Admit in part. Robbins asked Ryan if she (Ryan) needed to see <u>Lobato</u> (thereby specifically using Lobato's name) because Lobato was withdrawing from "meth." **Ex. 14**, Robbins Depo.,

---

[2] "Meth" obviously *could* have meant methadone, which is an opiate. CCS had trained its staff that methadone is an opiate. *See, e.g.*, **RSUMF** ¶ 3.

102:24-103:22; **Ex. 11**, 90:3-91:7. Ryan responded merely by stating that there was nothing she could give Lobato if she is withdrawing from meth so she did not need to see her at that time. **Ex. 13**, 103:24-104:1; **Ex. 6**, 39:3-19. Ryan was just a 10 to 15 second walk away from Lobato when Robbins told her Lobato was withdrawing and Ryan chose not to check on Lobato or ask anyone else to check on Lobato. **Ex. 11**, 24:5-18; **Ex. 6**, 90:13-22 (no reason why Ryan could not check on Lobato at time). Also, Ryan failed to ask Robbins to clarify what she meant by "meth," failed to ask about Lobato's ability to ambulate, failed to ask if Lobato had been vomiting, failed to ask if Lobato had a loss of appetite, failed to ask if Lobato had any diarrhea, failed to any other questions about Lobato's condition, and failed to make any note in Lobato's medical record that Lobato reportedly was withdrawing from "meth." **Ex. 14**, 120:20-121:13. This occurred even though Ryan knew Lobato was withdrawing from a drug, knew Lobato may be withdrawing from an opiate, had been trained to promptly evaluate and treat the symptoms of *all* types of withdrawal (including methamphetamine withdrawal), and had been trained that *all* types of withdrawal could be deadly if treatment is even briefly delayed. *See id.*; *see also* **RSUMFs** ¶¶ 3, 15. At Jefferson County Detention Center, if the nurse was on the floor passing medications, as Ryan was here, it was expected that the nurse talk to any inmate with a complaint in order to determine whether the inmate needed to be seen in medical or if the problem could be handled on the floor. *See* **Ex. 10**.

18. Admit in part. Ryan consciously made the choice not to ask if Lobato was vomiting despite knowing Lobato was going through "meth" withdrawal at the time or evaluate her despite her known complaints; therefore, Ryan was never explicitly told Lobato was vomiting. CCS medical personnel like Ryan – not security personnel like Robbins – were, with very few exceptions (none of which existed here at the time), the onsite staff responsible for evaluating and treating

6

the medical needs of inmates. *See* **RSUMF** ¶ 15; *see also* **Ex. 14**, 120:2-120:15 (guards cannot put inmates on withdrawal protocol). Moreover, Ryan knew based on her medical training that Lobato likely was vomiting because Ryan knew Lobato was withdrawing from "meth." *See* 3-4. She also knew that Lobato had been unwell earlier in the day. *See* **RSUMFs** ¶¶ 10-11.

19-20. Admit.

21. Admit that Curtis called Whinnery at about 5:00 p.m. and told Whinnery that Lobato was withdrawing from Methadone (which Whinnery knew was an opiate, *see, e.g.*, **Ex. 12**, 20:25-21:1-6; *see also* 3-4 (describing CCS training on opiate withdrawal)) *and* told Whinnery that Lobato was vomiting. **Ex. 6**, 92:14-17; **Ex. 15**, Ashley Robbins Report and Interview; **Ex. 12**, 20:15-22.

22. Admit that Whinnery deliberately indifferently told Curtis that Lobato would not be seen by her or any other medical staff for another approximately two to four hours despite knowing that Lobato was withdrawing from an opiate and vomiting at the time. *See* **RSUMF** ¶ 21. Whinnery also knew at the time that opioid withdrawal can quickly become fatal because of dehydration arising from improperly-treated vomiting and that Lobato had been in law enforcement custody for more than 24 hours already without being evaluated or treated for withdrawal. *See* **Ex. 12**, 20:9-21:15, 23:20-25. It would have taken Whinnery about one minute to go up from the third floor where she was located to the sixth floor where Lobato was located. **Ex. 6**, 91:21-92:10. Even Whinnery's own co-Defendant, nurse Ziegelman, testified that, once Whinnery learned that Lobato was withdrawing from Methadone, Whinnery should have immediately made a further inquiry of the deputes, immediately gone up to see Lobato herself, or immediately instructed a nurse on the sixth floor to check on Lobato. **Ex. 2**, 76:14-77:20. But Whinnery intentionally did none of those things.

23. Admit that, despite everything she knew, Whinnery merely – and with utter indifference to Lobato's dire and time-sensitive medical needs – left a note for Ziegelman in the pass-on log telling her that Lobato "states methadone." **Ex. 2**, 77:21-78:15; pass-on log. Ziegelman knew at the time that Lobato was withdrawing from methadone. **Ex. 2**, 75:13-15.

24. Deny. A disputed issue of material fact exists regarding this critical issue. *See* **RSUMF** ¶ 21.

25-27. Admit.

### **Statement of Additional Disputed Material Facts ("SADMF")**

1. Opiate withdrawal is a common medical complaint from inmates at JCDF; at any given moment, approximately 5-10% of the inmate population is experiencing some sort of opiate withdrawal. **Ex. 2**, 32:7-15.

2. Defendant Ziegelman admitted that: (1) if any of her co-Defendants were notified that Lobato was vomiting (at least Whinnery knew this hours before Lobato died, *see* **RSUMF** ¶ 21), they should have checked on her immediately or requested that another nurse check on Lobato immediately, **Ex. 2**, 37:6-13; and (2), if any of her co-Defendants were notified that Lobato was going through withdrawal (Whinnery, Romero, Ryan, and Ziegelman *all* knew this hours before Lobato died, *see* **RSUMFs** ¶¶ 14, 17, 21, 23), they should have immediately asked follow-up questions such as what symptoms is Lobato showing and how long has Lobato been like this, **Ex. 2**, 37:14-21, 41:4-42:4 (further admitting that medical response such as "I'll check her later this evening" is inadequate). As discussed, Whinnery, Romero, Ryan, and even Ziegelman herself *all* failed to do any of these incredibly important, basic, and obviously-warranted things that would have saved Lobato's life.

3. The medical care Whinnery provided and deliberately failed to provide to Lobato fell woefully and recklessly short of the standard of care that applies to nurses in correctional settings. *See* **Ex.**

**16**, Jane Grametbauer Expert Report at 11-13 ("For RN Whinnery to assume that Ms. Lobato did not have an emergent medical condition, despite being aware that Ms. Lobato was withdrawing from Methadone, is a grossly inadequate and unprofessional medical response. Obtaining information from patients and from deputies about an inmate, is a basic nursing function.  Failure to obtain even the most basic information to determine the urgency of Ms. Lobato's complaint, despite being aware of her serious medical need caused by Methadone withdrawal, in my opinion, shows a callous disregard for the welfare of Ms. Lobato and directly contributed to the deterioration of her condition.").

4. As Plaintiffs' nursing practices expert further states: "Whinnery was the dayshift charge nurse. As a nurse in a supervisory position, RN Whinnery certainly had to have understood . . . that her failure to perform the most basic of nursing functions was unacceptable." **Ex. 16** at 12; *see also* **Ex. 12**, 45:2-12.

5. The medical care Ryan provided and deliberately failed to provide to Lobato fell woefully and recklessly short of the standard of care that applies to nurses in correctional settings. **Ex. 16** at 6-10 ("LPN Ryan's failure to ask the deputy even the most basic questions about Ms. Lobato, her failure to examine Ms. Lobato as was indicated, in my opinion, directly resulted in the continued deterioration of Ms. Lobato's condition and the resulting cardiac arrest. Her actions show a callous disregard for the welfare of Ms. Lobato.").

6. The medical care Romero provided and deliberately failed to provide to Lobato fell woefully and recklessly short of the standard of care that applies to EMTs in correctional settings. **Ex. 16** at 10-11 ("EMT-B Romero's failure to ask the most basic questions of the deputy regarding Ms. Lobato and her failure to notify medical about the telephone call, in my opinion, directly resulted in the continued deterioration of Ms. Lobato's condition.").

7. Plaintiffs' nursing practices expert also will testify at trial:

> Deputies received an in-service about what information to have ready for the nurse. However, although the deputies had an in-service about information needed by medical staff, it does not release the nurse from the responsibility of asking appropriate questions of the deputy.  If critical information is not provided by the deputy, then it is the nurse's responsibility to obtain the needed information. The nurse must obtain sufficient information to determine the urgency of the call.

**Ex. 16** at 13.

8. Had Defendants Whinnery, Ryan, Ziegelman, and/or Romero[3] caused Lobato to be placed on

an opiate protocol (which existed at the time for various types of opiates, including methadone,

**Ex. 2**, 40:23-25) and/or in the special housing unit suitable for inmates experiencing withdrawal

(*including* methamphetamine withdrawal), as they obviously should have based on what they

knew at the time, then onsite medical staff would have more frequently checked on Lobato. **Ex.**

**19**, Longshore Depo., 14:15-15:17.

9. Lobato's serious medical needs arising from opiate withdrawal-related complications (such as

an electrolyte imbalance) could have been adequately evaluated and treated in a quick, simple,

and easy manner from a medical perspective:

> Simple blood testing done in a medical facility such as a detention center clinic or hospital emergency department can identify these electrolyte disturbances quickly in a matter of 15-30 minutes. Electrocardiograph testing can easily demonstrate cardiac arrhythmias that are a result of those electrolyte derangements.  Intravenous fluid administration with electrolytes can reverse the dehydration, treat the electrolyte deficiencies, and often reverse the nausea and vomiting seen with withdrawal states. Common medications to control nausea can be administered. None of these treatments require sophisticated complex medical surroundings but could be done in simple clinic surroundings. Had Jennifer Lobato been examined briefly by a medical personnel such as a nurse or paramedic, her vital signs could have been obtained. They most likely would have shown a rapid pulse or

---

[3] While Romero, as an EMT, may not have been able to singlehandedly place Lobato on an opiate withdrawal protocol or in the special unit after intake, Romero admitted that she had the authority, ability, and duty to put such protocols "into play" after the intake phase by promptly contacting a nurse to ensure they were fully apprised of Lobato's medical condition/needs. **Ex. 3**, 83:12-22.

tachycardia, low or high blood pressure, or other cardiac arrhythmias could have been found. Those quick and easily obtained vital signs would have confirmed her history of opiate use and abuse, and the withdrawal state could have been confirmed. Basic medical supportive care could have been provided and her symptoms improved. Transport to a hospital emergency department and assessment there was also a reasonable plan if the detention facility was not staffed appropriately.

**Ex. 17**, Michael Jobin, M.D. Report at 4. *See also* **Ex. 18**, Joshua Blum, M.D. Report at 5-7.

10. Whether or not the Defendants were specifically aware that Lobato was withdrawing from a particular type of opiate (as opposed to "meth" (which certainly *could* have meant methadone)) is legally inconsequential for purposes of summary judgment:

Ultimately, the cause of the vomiting is of secondary relevance here. Whether Ms. Lobato had instead suffered from an infectious gastroenteritis, an inner ear infection, or even a pregnancy, intractable vomiting is obviously and clearly a serious medical condition that requires urgent assessment. In this case, the specific diagnosis of opioid withdrawal should have triggered heightened assessment and monitoring. Instead it had the opposite effect, as the stigma of drug use apparently produced a punitive and deliberately indifferent response from jail security and medical staff alike.

**Ex. 18** at 6.

11. Had the Defendants provided any appropriate medical care to Lobato in any of the exceedingly basic ways described above, even up to the time near her cardiac arrest, Lobato's life would have been saved. *See generally* **Exs. 17 and 18**. Thus, Defendants' deliberate indifference to Lobato's serious and obvious medical needs caused her death, along with many hours of unnecessary pain and suffering as she vomited again and again and again, and slowly and excruciatingly perished from dehydration.

### Standard of Review

Summary judgment is appropriate only if the record contains no evidence of a genuine issue Summary judgment is only appropriate if the record contains no evidence of a genuine issue of material fact and demonstrates that the moving party is entitled to judgment as a matter

11

of law. *Woodman v. Runyon*, 132 F.3d 1330, 1337 (10th Cir. 1997). "The party that moves for

summary judgment bears the burden of proving that no genuine issue of material fact exists on

all claims for which it seeks summary judgment." *Trujillo v. Atmos Energy Corp.*, 2012 U.S.

Dist. LEXIS 87273, at *4 (June 25, 2012). "Where different ultimate inferences may be drawn

from the evidence presented by the parties, the case is not one for summary judgment." *Brown v.

Parker-Hannifin Corp.,* 746 F.2d 1407, 1411 (10th Cir. 1984).

<strong><u>Argument</u></strong>

I.    <strong><u>Defendants violated Lobato's Fourteenth Amendment[4] right to receive adequate medical care.</u></strong>

"A prison official's deliberate indifference to an inmate's serious medical needs is a

violation of the Eighth Amendment's[5] prohibition against cruel and unusual punishment." *Mata

v. Saiz,* 427 F.3d 745, 751 (10th Cir. 2005). Deliberate indifference involves both an objective

and a subjective component. *Id.* Under the objective prong, "the prisoner must produce objective

evidence that the deprivation at issue was in fact sufficiently serious." *Id*. It is the harm claimed

by the prisoner that must be sufficiently serious to satisfy the objective component, and not

---

[4] *Kingsley v. Hendrickson* obviates prior precedent and calls for the utilization of an objective standard in evaluating pretrial detainees' claims under the Fourteenth Amendment. *See Castro v. Cnty. of L.A.*, 2016 U.S. App. LEXIS 14950, *19 (9th Cir. Aug. 15, 2016) (en banc); *Castro v. County of Los Angeles*, 797 F.3d 654, 681 (9th Cir. 2015) (Callahan, J., concurring); *Abila v. Funk*, No. CIV 14-1002 JB/SMV, 2016 U.S. Dist. LEXIS 162474, at *146 (D.N.M. Nov. 23, 2016). Plaintiffs nonetheless analyze Lobato's Fourteenth Amendment claim under the pre-*Kingsley* subjective standard because Defendants evaluate Plaintiffs' claims under that standard, Plaintiffs are easily able to satisfy the subjective standard at this stage, and Plaintiffs therefore also easily satisfy the less rigorous (for Plaintiffs) *post-Kingsley* objective standard.

[5] Because Lobato was a pre-trial detainee (she was charged with a crime but had not been convicted or, for that matter, even been to arraignment when she died), the denial of adequate medical care implicates the Fourteenth Amendment. *See Lopez v. LeMaster*, 172 F.3d 756, 759 n.2 (10th Cir. 1999). But, in determining whether Lobato's rights were violated, the Court's analysis under the pre-*Kingsley* standard is the same as in Eighth Amendment cases. *See Id*. (citing *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979)).

solely "the symptoms presented at the time the prison employee has contact with the prisoner."

*Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009) (citation omitted). A medical need will

be sufficiently serious "if is one that has been diagnosed by a physician as mandating treatment

or one that is so obvious that even a lay person would easily recognize the necessity for a

doctor's attention." *Mata*, 427 F.3d at 751. In addition, a delay in medical care constitutes an

Eighth Amendment violation where the plaintiff can show that the delay resulted in substantial

harm, which may be evidenced by "lifelong handicap, permanent loss, or considerable pain." *Id*.

The subjective component of the deliberate indifference test is satisfied if the official

knows of and disregards a substantial risk to inmate health or safety. *See Self v. Crum*, 439 F.3d

1227, 1231 (10th Cir. 2006). That is, the defendant must have had actual knowledge of the

plaintiff's serious medical needs and have disregarded that "risk by failing to take reasonable

measures to abate it." *Hunt v. Uphoff,* 199 F.3d 1220, 1224 (10th Cir. 1999). An inmate,

however, need not "show that a prison official acted or failed to act believing that harm actually

would befall an inmate; it is enough that the official acted or failed to act despite his knowledge

of a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994). Whether "a

prison official had the requisite knowledge of a substantial risk is a question of fact subject to

demonstration in unusual ways, including inference from circumstantial evidence." *Id*. Thus,

actual knowledge may be inferred from circumstantial evidence, including but not limited to the

fact that the risk of harm was obvious. *Id*. A harm will be obvious in circumstances including,

but not limited to where "(1) a medical professional recognizes the need for further medical

treatment and declines or refuses to provide a referral; (2) a medical professional fails to treat a

condition that would have been obvious even to a layperson; or (3) where a medical professional

13

denies care though presented with recognizable symptoms." *Walker v. Hickenlooper*, 2015 U.S. App. LEXIS 17727, at \*16-17 (10th Cir. 2015) (citing *Self*, 439 F.3d at 1232).

Two general types of conduct constitute deliberate indifference. First, a court will find deliberate indifference where "a medical professional" fails to "treat a serious medical condition properly." *Self*, 439 F.3d at 1231. While a defendant cannot be liable for mere negligence, a jury may infer conscious disregard where the defendant responds to an obvious risk with treatment that is patently unreasonable. *Id.* at 1232. Second, deliberate indifference will be found where a prison official has prevented "an inmate from receiving medical treatment" or has denied "access to medical personnel capable of evaluating the inmate's condition." *Id.* at 1231. Where the defendant solely serves as a "gatekeeper" for other medical personnel capable of treating the condition, she will only be liable for the deliberate indifference to the medical needs of the inmate "if she delays or refuses to fulfill that gatekeeper role due to deliberate indifference." *Mata*, 427 F.3d at 751.

### A.     Lobato suffered a sufficiently serious medical need.

A medical need is sufficiently serious to implicate the Eighth and Fourteenth Amendments[6] "if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Hunt*, 199 F.3d at 1224 (internal citation omitted). Death is "sufficiently serious" for purposes of the objective component of the deliberate indifference test

> As to the objective component of the test for deliberate indifference, [the plaintiff]
> simply contends, "Obviously, death satisfies this requirement." . . . . [The plaintiff]
> does not contend that intoxication alone is a sufficiently serious harm. We agree

---

[6] Lobato's right to adequate medical care was secured by the Fourteenth Amendment at all relevant times. However, assuming, *arguendo*, that the Eighth Amendment applied to her instead, the underlying *Pre-Kingsley* standard is the same under both amendments and, therefore, Defendants also violated Lobato's rights secured by the Eighth Amendment.

14

with [the plaintiff] and the district court that "*the ultimate harm to [the decedent], that is, his heart attack and death, w[as], without doubt, sufficiently serious to meet the objective component necessary to implicate the Fourteenth Amendment.*"

*Martinez*, 563 F.3d at 1088-89. Lobato died because of the CCS Defendants repeatedly and deliberately failed to provide her with medical attention to treat her obvious and worsening withdrawal. The fatal harm Lobato suffered (and it is the ultimate harm that matters here) was, therefore, "without doubt, sufficiently serious to meet the objective component." *Id.* Furthermore, numerous courts have held specifically that heroin withdrawal is a serious medical need in and of itself. *See, e.g.*, *Ramos v. Patnaude*, 640 F.3d 485, 487, 489 (1st Cir. 2011) (describing life-threatening symptoms experienced by one heroin addict during a managed withdrawal); *Foeller v. Outagamie Cnty.*, 394 F.3d 510, 513 (7th Cir. 2005) (finding opiate withdrawal amounts to a serious medical need); *Gonzalez v. Cecil Cnty.*, 221 F. Supp. 2d 611, 616 (D. Md. 2002) (finding that heroin withdrawal is a serious medical need).

## B. Defendants responded with deliberate indifference to Lobato's serious and obvious medical needs.

"To prevail on the subjective component, [a plaintiff] must show that the defendants knew he faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it." *Callahan v. Poppell*, 471 F.3d 1155, 1159 (10th Cir. 2006) (internal quotation marks omitted). A plaintiff need not plead a defendant's acts or omissions were taken "for the very purpose of causing harm or with knowledge that harm will result." *Brennan*, 511 U.S. at 835. Instead, a plaintiff need only allege that a defendant was made aware of the risk of harm and failed to treat it. *Id.* Plaintiffs have done so here.

"Unlike the objective component, the symptoms displayed by the prisoner are relevant to the subjective component of deliberate indifference. The question is: were the symptoms such that a prison employee knew the risk to the prisoner and chose (recklessly) to disregard it?"

15

*Martinez*, 563 F.3d at 1089 (internal quotation marks and citation omitted). As described in detail above, Lobato exhibited serious and obvious signs of withdrawal from the moment she was placed in Unit 6A on the evening of March 1st and the CCS Defendants were sufficiently aware of these symptoms to draw the inference that Lobato needed immediate medical attention. At least Whinnery knew Lobato vomited hours before she died; Romero and Ryan knew Lobato was withdrawing from "meth" hours before she died; Ziegelman and Whinnery knew Lobato was withdrawing methadone hours before she died; and Whinnery, Romero, Ryan, and Ziegelman *all* knew Lobato was going through withdrawal hours before she died. All these Defendants also knew that Lobato had not been placed on any withdrawal protocol hours before she died. Moreover, Whinnery, Romero,[7] Ryan, and Ziegelman had all been trained at the time that opioid withdrawal including methadone withdrawal can lead to vomiting, that vomiting can quickly lead to dehydration, that dehydration can quickly lead to death, that dehydration can be easily treated if it is promptly addressed, and that *all types of* withdrawal can be fatal if improperly treated, including even a brief delay in treatment. Thus, all the CCS Defendants were "aware of facts from which the inference could be drawn that a substantial risk of serious harm existed." *Lopez*, 172 F.3d at 764.

It is hardly surprising that the Defendants now falsely deny having perceived Lobato's serious medical needs in an attempt to avoid liability. That is why a jury "may infer existence of this subjective state of mind from the fact that the risk of harm is obvious." *See Hope v. Pelzer*, 536 U.S. 730, 738 (2002); *see also Durkee v. Minor*, 841 F.3d 872, 876 (10th Cir. 2016) ("The question whether Defendant Hochmuth was aware of facts from which he drew the inference that

---

[7] Plaintiffs' claim against Romero is based on her failure to even try to procure medical aid for Lobato when she learned that Lobato claimed to be withdrawing from "Meth."

16

a risk of harm to Plaintiff existed while in the visitation room is for the factfinder."). A jury

could reasonably find that the risk of harm was obvious to all of the Defendants here. Moreover,

Defendants' intentional decisions to bury their heads in the sand in response to their knowledge

that Lobato was withdrawing (which conveyed that Lobato had serious medical needs in and of

itself based on their medical training and knowledge; Plaintiffs are, after all, suing medical

professionals not laypersons here) does not provide them with a defense from liability. To the

contrary, it reinforces their deliberate indifference:

> [T]hese defendants knew that Plaintiff was in distress but, nevertheless, failed to
> obtain proper or adequate assistance, *or even make any effort to ascertain Plaintiff's
> condition*. This alleged inaction is *well beyond the bounds of negligence*; the alleged
> refusal to assist further delayed Plaintiff's ability to obtain adequate treatment and
> purportedly caused Plaintiff to suffer significant pain and discomfort, which did not
> "serve any penological purpose."

*Mallory v. Jones*, No. 10-cv-02564-CMA-KMT, 2011 U.S. Dist. LEXIS 48378, at *19 (D. Colo.

May 3, 2011) (emphases added); *see also Mata*, 427 F.3d at 752 (a defendant cannot "escape

liability if the evidence showed that he merely refused to verify underlying facts that he strongly

suspected to be true, or declined to confirm inferences of risk that he strongly suspected to

exist[]"). Further reinforcing their deliberate indifference, all of the Defendants had an extended

opportunity (hours) to save Lobato's life along with the requisite knowledge to conclude that she

needed immediate medical aid – but instead deliberately indifferently allowed her to slowly die.

*See, e.g.*, *Radecki v. Barela*, 146 F.3d 1227, 1232 (10th Cir. 1998) (extended opportunity to

deliberate increases defendant's culpability); *see also Howard v. Waide*, 534 F.3d 1227, 1239-40

(10th Cir. 2008) ("An official responds to a known risk in an objectively unreasonable manner if

he knew of ways to reduce the harm but knowingly [or] recklessly declined to act . . . In

determining whether prison officials acted reasonably, [a court] consider[s] what actions they

took, if any, as well as available alternatives that might have been known to them.") (internal

17

quotation marks omitted) (alteration in original); *Lancaster v. Monroe Cnty.*, 116 F.3d 1419, 1426 (11th Cir. 1997) (ignoring the dangers of withdrawal and waiting for a "manifest emergency" before summoning medical help constituted deliberate indifference).

While Defendants' utter failure to act is, in and of itself, sufficient to establish a Fourteenth Amendment violation, their failure to act also creates an additional ground for liability in that it caused a delay in medical treatment that eventually caused Lobato's death. Within the context of a failure to provide medical care claim, "[e]ven a brief delay may be unconstitutional." *Mata*, 427 F.3d at 755. Further, "[d]elays that courts have found to violate the Eighth Amendment have frequently involved life-threatening situations and instances in which it is apparent that delay would exacerbate the prisoner's medical problems." *Hunt*, 199 F.3d at 1224. Here, the delay did more than exacerbate Lobato's medical problems – it directly led to her untimely death. Thus, not only were the Defendants well aware that Lobato faced a substantial risk of harm, they also failed to take any reasonable steps to abate the risk of harm despite having an extended chance to evaluate and treat her utilizing the exceedingly basic methods detailed in the reports of Drs. Jobin and Blum attached hereto (such as taking her vital signs, administering anti-nausea drugs, and rehydrating her with a Gatorade-like substance and/or saline IV fluids). Finally, Defendants' reliance upon their affidavits at summary judgment exs. 4, 5 & 11 is "'self-serving' and cannot form the basis for granting summary judgment." *See Ambraziunas v. Hatch*, 23 F. Supp. 2d 1202, 1204 (D. Colo. 1998).

## II.    <u>Summary judgment is particularly unwarranted here because Lobato is dead.</u>

Courts should be especially circumspect in granting summary judgment in a case like Lobato's, where the victim is dead (as a result of the defendants' challenged conduct) and thus unable to provide their own testimony regarding the defendants' wrongdoing. As the Tenth

18

Circuit explained in *Pauly v. White*, 814 F.3d 1060, 1079-80 (10th Cir. 2016), *vacated on other grounds*, 196 L.Ed.2d 463 (U.S. 2017), in affirming the district court's denial of summary judgment.

> "[S]ince the victim of deadly force is unable to testify, courts should be cautious on summary judgment to 'ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story—the person shot dead—is unable to testify.'" *Id.* (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)). As the Ninth Circuit noted in *Scott*, 39 F.3d at 915, "the court may not simply accept what may be a self-serving account by the police officer." Rather, "[i]t must also look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably." *Id.* In any event, this factor highlights the district court's ultimate conclusion that genuine fact issues remain for the jury with respect to this issue.

*See also Flythe v. D.C.*, 791 F.3d 13, 19 (D.C. Cir. 2015) ("An African proverb teaches that only when lions have historians will hunters cease being heroes. . .  Under these circumstances, where 'the witness most likely to contradict [the officer's] story—the person [he] shot dead—is unable to testify,' . . . courts must 'carefully examine all the evidence in the record[.]) (internal citation omitted). The same sound reasoning applies here – and amplifies the need for a jury to carefully weigh and compare each Defendants' credibility when testifying, as part of its evaluation as to whether Plaintiffs have proven their claims.

III.    **Plaintiffs' state law claims are properly before this Court.**

As discussed above, and particularly applying the high standards for granting a motion for summary judgment in a death case, Plaintiffs' § 1983 claims should proceed to trial and federal question jurisdiction therefore remains. Pursuant to 28 U.S.C. § 1367(a), this Court can and should maintain supplemental jurisdiction over Plaintiffs' state law claims. And even if this Court incorrectly dismisses Plaintiff's federal claims, it should still retain jurisdiction over Plaintiffs' state law claims, as Defendants Romero, Ryan, and Whinnery have failed to request

19

that the Court summarily judge these claims and it is "not the Court's responsibility to *sua sponte* construct arguments in support of Defendant[s]' [Motion for Partial Summary Judgment]." *See Carbajal v. St. Anthony Cent. Hosp.*, 2013 U.S. Dist. LEXIS 129034, at *33-36 (D. Colo. July 8, 2013) (collecting cases), *report and recommendation rejected in part on other grounds*, 2013 U.S. Dist. LEXIS 129036. This also would be more expedient and efficient for all parties and the courts than leaving Plaintiffs with no choice but to re-file their case in state court, after it has been litigated here since December 2015.

### Conclusion

WHEREFORE, for all the reasons above, Defendants Romero's, Ryan's, and Whinnery's Motion for Partial Summary Judgment should be entirely denied.

RESPECTFULLY SUBMITTED this 22nd day of September 2017.

| | |
|---|---|
| */s/ Erica T. Grossman*<br>Anna Holland Edwards<br>Erica T. Grossman<br>John R. Holland<br>HOLLAND, HOLLAND EDWARDS & GROSSMAN, PC<br>1437 High Street<br>Denver, CO  80218<br>erica@hheglaw.com<br>ATTORNEYS FOR ANGELICA DELGADO | */s/ Michael Fairhurst*<br>David A. Lane<br>Darold Killmer<br>Michael Fairhurst<br>KILLMER, LANE & NEWMAN, LLP<br>1543 Champa Street, Suite 400<br>Denver, CO 80202<br>mfairhurst@kln-law.com<br>ATTORNEYS FOR PLAINTIFFS PAUL MONTOYA, J.M., A.Z., AND V.M. |
| */s/ Michael Bahr*<br>Michael P. Bahr<br>Benjamin Flicker<br>BAHR, KREIDLE & FLICKER<br>2596 W. Alamo Ave.<br>Littleton, CO  80120<br>mbahr@qwestoffice.net<br>ATTORNEYS FOR PLAINTIFFS L.F. I.F. AND A.F. | |

20

**CERTIFICATE OF SERVICE**

I certify that on this 22nd day of September, 2017 I filed a true and correct copy of the

foregoing via CM/ECF which will generate notice to the following via the Court's filing sysem:

C. Gregory Tiemeier
Daniel Mauk
1000 East 16th Ave.
Denver, CO 80218
Phone:  303-531-0022
Fax:  303-531-0021
gtiemeier@tslawpc.com
dmauk@tslawpc.com
*Attorneys for Defendants*
*Correct Care Solutions, LLC,*
*Correctional Healthcare Companies, Inc.*
*Bryan Muscutt, Jessica Romero,*
*Caroline Ryan, Brianna Whinnery,*

Edward J. McNelis, III
Christopher F. Quirk
Sands Anderson
1111 East Main Street, Suite 2400
PO Box 1998
Richmond, VA 23218-1998
Phone: 804-648-1636
Fax: 804-783-7291
emcnelis@sandsanderson.com
cquirk@sandsanderson.com

Andrew Ringel
Christina Gunn
Mark Ratner
Hall & Evans, LLC
1001 Seventeenth Street, Suite 300
Denver, CO 80202
Phone:  303-628-3300
Fax:  303-628-3368
ringela@hallevans.com
gunnc@hallevans.com
ratnerm@hallevans.com
*Attorneys for Esme Ziegelman*

*s/ Jamie Akard*
Jamie Akard

21